ANCHORAGE, a Municipal
Corporation, Appellant,

v.

James E. SANDBERG, S.S. Davis and
Theodore A. Richards, Appellees.

No. S–4777.

Supreme Court of Alaska.

Oct. 1, 1993.

Ann Waller Resch, Deputy Mun. Atty. and Richard L. McVeigh, Mun. Atty., Anchorage, for appellant.

Calvin R. Jones, Hoge and Lekisch, Anchorage, for appellees.

Before MOORE, C.J., and RABINOWITZ, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

MOORE, Chief Justice.

### I. INTRODUCTION

In this inverse condemnation action, the Municipality of Anchorage (municipality) appeals the trial court's grant of summary judgment in favor of Sandberg, Davis and Richards (SD & R). The municipality argues that the court erred in finding that its activities resulted in a taking of SD & R's property pursuant to art. I, § 18 of the Alaska Constitution. We reverse the court's grant of summary judgment in favor of SD & R and remand the case for entry of summary judgment in favor of the municipality.

1. In 1983 SD & R owned 12 lots in the area; the municipality owned 12 lots; other individual owners owned five lots. The proposed sewer and water districts would provide services to all

### II. FACTS AND PROCEEDINGS

The facts in this case are not disputed. Between April 1982 and March 1983 SD & R acquired 12 lots in an undeveloped subdivision located in the midtown area of Anchorage with the intention of improving and reselling the lots. Water, sewer and road districts were needed to develop the property.

In May 1983 SD & R and other property owners in the subdivision petitioned for the creation of sewer and water assessment districts to provide sewer and water to the area.[1] The Assembly approved the sewer district in May 1984 and the water district a few months later. Following this approval, Anchorage Water and Wastewater Utility informed SD & R that construction of the water and sewer improvements would take place at the same time as construction of Altoona Drive in order to keep costs down. In June 1984 SD & R petitioned the municipality to create a road improvement district for the construction of Altoona Drive. However, SD & R requested that actual balloting for the Altoona Drive improvement district be delayed until it could be determined whether state funding was available.

In September 1984 SD & R sold nine of its 12 lots to the municipality for an extension of Gladys Wood Park. A year later, SD & R acquired the remaining five lots in the area, leaving SD & R with a total of eight lots. SD & R then obtained preliminary approval to subdivide these eight contiguous lots into 12 lots. As a result of SD & R's purchases, all the property within the pending improvement districts was owned by three entities: the municipality, SD & R and A–C Investments.

In May 1986, after the municipality informed SD & R that state money would not be available for the construction of Altoona Drive, SD & R renewed its petition for the road improvement district. Later in the summer, SD & R voted in favor of a park improvement district authorizing the purchase of the 12 acre parcel owned by A–C

these lots plus a 12 acre lot owned by A–C Investments, located on the other side of the dedicated but unconstructed road, Altoona Drive.

Investments for an extension of Gladys Wood Park. After the Assembly approved the park improvement district in June, A–C Investments sold the municipality the 12 acre parcel. This sale left SD & R's eight lots surrounded on three sides by municipal property designated as park land.

Because the municipality's share of the approved water and sewer assessments exceeded the assessed value of SD & R's eight unimproved lots, SD & R wrote to the mayor in July, suggesting that the municipality purchase its lots.[2] Recognizing that its park acquisitions had created a problem, the Department of Parks and Recreation (the Department) began negotiating with SD & R in order to find a mutually satisfactory solution.

In October 1986 the Department informed SD & R that there was no possibility of a cash purchase and suggested a land trade. It also informed SD & R that it would oppose the Altoona Drive improvement district because a road was not necessary for park use and because construction costs were too high. The suggested land trade never occurred.

In March 1987 the municipality initiated a petition to "re-ballot" the approved water and sewer districts, claiming that new soils information indicated that construction costs would be significantly higher than originally estimated.[3] SD & R protested the re-balloting, claiming that the municipality was attempting to walk away from a situation created by its park acquisitions in the area. In the re-balloting, the municipality voted its majority interest in opposition to the improvement districts while SD & R voted its minority interest in favor. The municipality prevailed and the Assembly abolished the water and sewer districts in December 1987.

In March 1988 SD & R filed an action for inverse condemnation. On cross-motions for summary judgment on the issue of liability, Superior Court Judge Rene Gonzalez found that the municipality's actions had had an adverse impact on the value of SD & R's property and that the municipality's actions constituted a taking.[4] This appeal followed.[5]

## III. DISCUSSION

### A. Standard of Review

We will only reverse a grant of summary judgment if there exists a genuine issue of material fact or if the success-

---

2. Anchorage Water and Wastewater Utility's cost estimates of the approved water and sewer districts totalled $283,621. As a result of the 12 acre purchase, the municipality assumed a pro rata share of $212,736 in the approved improvement districts. In 1986, the assessed value of SD & R's eight lots was $161,900 (approximately $20,230 per lot).

3. AMC 19.30.070 allows re-balloting of a previously approved improvement district if construction costs increase by more than 10% between the time of Assembly approval and eventual construction. The municipality's petition read, in part:

 At the time [the sewer and water improvements were created], costs were estimated based on the simultaneous construction of a Road Improvement District along the proposed alignment. Since the creation [of the improvement districts], soils investigations proved the area to be heavily laden with peat soils ranging in surface depths from three to twenty-five feet. The additional cost of excavation boosted the cost of the project extensively. Property owners had also requested the road improvements be contingent on grant funding or anticipated State appropriations. Three years have passed, and still

funding priorities have not allowed the road improvements.

On cross-motions for summary judgment, Superior Court Judge Rene Gonzalez found that the municipality had failed to present any evidence indicating that new soils information existed.

4. The trial court focused on three actions by the municipality: (1) the municipality's purchases of park land in the area; (2) its votes against the approved water and sewer districts; and (3) its decision not to participate in the road improvement district. The court concluded that SD & R's property could not be feasibly developed because, as a result of the municipality's actions, the development costs of SD & R's eight lots would exceed the fair market value of SD & R's property as improved.

5. In August 1991 the trial court entered final judgment, ordering the municipality to pay SD & R $417,462 in compensation pursuant to the parties' stipulation (the municipality reserving its right to appeal the issue of liability). This figure represents $265,000 in compensation (approximately $33,120 per lot), $121,121 in prejudgment interest, $4,322 in costs and $22,928 in attorney's fees.

ful movant was not entitled to judgment under the applicable law. *Wassink v. Hawkins,* 763 P.2d 971, 973 (Alaska 1988). We review *de novo* questions of constitutional law. *Diedrich v. City of Ketchikan,* 805 P.2d 362, 365 (Alaska 1991).

B. Did the municipality's actions deprive SD & R of the economic advantages of land ownership, entitling SD & R to just compensation under art. I, § 18 of the Alaska Constitution?

 Judge Gonzalez found that the municipality's actions had "an adverse impact on the value of [SD & R's] property and such adverse impact constitutes a taking[ ] and property damage for which just compensation must be paid under Art. I, Sec. 18 of the Alaska Constitution." Article I, § 18 of the Alaska Constitution provides: "Private property shall not be taken or damaged for public use without just compensation." This clause is interpreted liberally in favor of the property owner. *State v. Doyle,* 735 P.2d 733, 736 (Alaska 1987). The inclusion of the term "damage" in the Alaska Constitution affords the property owner broader protection than that conferred by the Fifth Amendment of the Federal Constitution.[6] *State v. Hammer,* 550 P.2d 820, 824 (Alaska 1976).

 The United States Supreme Court has recognized two classes of *per se* takings: (1) cases of physical invasion and (2) cases where a regulation denies a landowner of all economically feasible use of the property. *See Lucas v. South Carolina Coastal Council,* — U.S. —, —— ——, 112 S.Ct. 2886, 2892–95, 120 L.Ed.2d 798 (1992).[7] When, as here, a case does not fall into either of these categories, courts must engage in a case-specific inquiry to determine whether governmental action effects a taking. *Id.,* at —— n. 8, 112 S.Ct. at 2895 n. 8. In *State, Dep't of Natural Resources v. Arctic Slope Regional Corp.,* 834 P.2d 134 (Alaska 1991), we identified several factors which the court should consider: (1) the character of the governmental action; (2) its economic impact; and (3) its interference with reasonable investment-backed expectations. *Id.,* at 138–39 (citing *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1000–05, 104 S.Ct. 2862, 2871–74, 81 L.Ed.2d 815 (1984)). The legitimacy of the interest advanced by the regulation or land-use decision is also relevant to this inquiry. *Id.,* at 143; *Agins v. City of Tiburon,* 447 U.S. 255, 260–61, 100 S.Ct. 2138, 2141–42, 65 L.Ed.2d 106 (1980).

**1. *Character of the Governmental Action***

 The concept of a "taking" has evolved over the years from the notion of a

6. The Fifth Amendment to the United States Constitution provides, in part: "nor shall private property be taken for public use, without just compensation."

7. In 1986 Lucas bought two residential lots on a South Carolina barrier island, intending to build single-family residential homes similar to those already constructed on neighboring parcels. In 1988 South Carolina enacted the Beachfront Management Act which directly prohibited Lucas from erecting any permanent habitable structures on his parcels. Lucas filed suit alleging that the Act deprived him of all economically viable use of his property and constituted a taking under the Fifth Amendment. The trial court held in favor of Lucas, finding that the ban rendered Lucas's parcels "valueless." *Id.,* at ——, 112 S.Ct. at 2889. On appeal, the South Carolina Supreme Court reversed, holding that when a regulation is intended to prevent harmful/noxious uses of property akin to public nuisances, no compensation is owed under the Takings Clause regardless of the regulation's effect on the property's value. *Id.,* at ——, 112 S.Ct. at 2890.

The United States Supreme Court rejected the South Carolina court's harmful/noxious use distinction and held that when a regulation prohibits all economically beneficial use of property, compensation is owed unless the regulation merely makes explicit restrictions on the use of property that background principles of the state's law of property and nuisance already place upon land ownership. *Id.,* at —— —— ——, 112 S.Ct. at 2896–2902. The Court reasoned that negative regulations such as the Beachfront Management Act, which typically require land to be left in its natural state, are the functional equivalent of physical appropriation from the standpoint of the landowner. *Id.,* at —— ——, 112 S.Ct. at 2894–95.

We conclude that the *per se* categories enunciated in *Lucas* have no application to the case at bar because the municipality neither sought to appropriate SD & R's property nor enacted a regulation constraining SD & R's use of its property in any way.

physical seizure to that of a diminution of the owner's rights and attributes of ownership. *See Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Nonetheless,

[a] "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Id.,* at 124, 98 S.Ct. at 2659 (citations omitted). This is so because regulations and other land use decisions, unlike physical invasion, do not typically extinguish the "full bundle" of rights in a particular piece of property. *Andrus v. Allard,* 444 U.S. 51, 65–66, 100 S.Ct. 318, 326–27, 62 L.Ed.2d 210 (1979). Government actions become "takings" under principles of inverse condemnation when a private land owner is forced to bear an unreasonable burden as a result of the government's exercise of power in the public interest. *Agins v. City of Tiburon,* 447 U.S. 255, 260–62, 100 S.Ct. 2138, 2141–42, 65 L.Ed.2d 106 (1980).

 This case involves neither a physical invasion nor even a regulation constraining SD & R's use of its property. Instead, it involves a series of municipal decisions which, indirectly, have rendered SD & R's development plans economically infeasible. To find a taking where the infringement of SD & R's property rights is so unclear, the severity of the economic impact and the reasonableness of SD & R's expectations concerning its development plans must weigh heavily in SD & R's favor.[8]

### 2. *Economic Impact*

The trial court found that the costs of developing SD & R's property without the improvement districts "would far exceed the fair market value of the lots as improved." Because SD & R could no longer feasibly develop its property as planned, the court concluded that SD & R had lost a significant economic advantage of ownership.

We have consistently held that a taking occurs when a landowner is deprived of substantially all beneficial use of property for a significant period of time due to a threatened or pending condemnation action. *See Homeward Bound, Inc. v. Anchorage Sch. Dist.,* 791 P.2d 610, 614 (Alaska 1990);[9] *Ehrlander v. State, Dep't of Transp.,* 797 P.2d 629 (Alaska 1990).[10] In *Homeward Bound,* we stated:

Private property is taken or damaged for constitutional purposes if the government deprives the owner of the economic advantages of ownership.

---

**8.** This case does not involve a physical seizure of property, pre-seizure activity which may accelerate the date when property is taken as in *Ehrlander v. State, Dep't of Transp.,* 797 P.2d 629 (Alaska 1990), or an exercise of regulatory authority by the municipality. Rather, it primarily entails action by the municipality as an owner of neighboring property voting to repeal an improvement district. Where a governmental agency merely takes action which is substantially similar to that which could be taken by a private landowner, it seems highly doubtful that a colorable taking claim can be established. *See, e.g., 8,960 Square Feet v. State, Dep't of Transp.,* 806 P.2d 843, 845–46 (Alaska 1991) (action by state on adjoining railway lands of raising earth berms gave rise to no claim for loss of visibility of landowner's property since the railroad could have raised its tracks or otherwise obstructed visibility of the land in question for any legitimate reason).

**9.** In *Homeward Bound,* a landowner sued the municipality of Anchorage, seeking, in part, to recover damages equal to the diminution in value of his property during the period that the property was designated as a potential school site. *Id.,* at 613–14. We held that the mere designation of property as a school site was not a concrete indication that the municipality intended to condemn the property and affirmed the trial court's dismissal of the claim.

**10.** In *Ehrlander,* we adopted the Washington Supreme Court's four-part test for determining whether a pending condemnation action deprives a landowner of the "most important incidents of ownership." *Id.,* at 634 (citing *Lange v. State,* 86 Wash.2d 585, 547 P.2d 282, 288 (1976)). Under the *Lange* test, a "taking" occurs only when (1) marketability of the property is substantially impaired; (2) the condemning authority has expressed unequivocally its intention to acquire the specific parcel of land; (3) the owner acquired the land specifically for subsequent development and sale; and (4) the owner has taken active steps to accomplish this purpose. *Id.*

791 P.2d at 614. We went on to observe that "[t]he economic advantages incident to ownership of unimproved property are the potential for appreciation and the opportunity for development." *Id.*, at 614 n. 6; *see also Stewart & Grindle, Inc. v. State*, 524 P.2d 1242, 1247 (Alaska 1974).[11]

This case differs significantly from *Homeward Bound, Ehrlander* and *Stewart* in that the municipality has never threatened or initiated condemnation proceedings. In fact, unlike the typical regulatory taking case,[12] the municipality has never placed any *direct* restrictions on SD & R's right to use and develop any portion of its property. Nevertheless we recognize that it has now become economically infeasible for SD & R to develop its land in part due to the municipality's change of plans. The real question presented by this case is whether SD & R's expectations concerning its development plans were reasonable and whether those expectations should be afforded constitutional protection.

### 3. *Reasonable Investment–Backed Expectations*

In *Arctic Slope*, we observed that, for taking purposes, " 'a reasonable invest-

ment-backed expectation' must be more than a 'unilateral expectation or an abstract need.' " 834 P.2d at 140 (citing *Ruckelshaus*, 467 U.S. at 1005, 104 S.Ct. at 2874) (holding that Alaska's Oil Conservation Act and regulations contained no "guarantee" or "express promise" that the Department of Natural Resources would not use well data for internal departmental purposes). It is undisputed that SD & R's lots could not be developed without the approval and construction of the necessary water, sewer and road improvements. In order to find a compensable taking under *Arctic Slope*, we would have to conclude that the Assembly's approval of the water and sewer districts constituted some kind of "guarantee" or "express promise" that the road improvement district providing access to SD & R's property would eventually be approved and constructed.[13] There is absolutely no basis for such a conclusion.

Even if the municipality had not rescinded the water and sewer improvement districts, SD & R still could not have feasibly developed its property unless the municipality also voted in favor of the road improvement district. In 1985 the City Engineers Office estimated it would cost ap-

11. In *Stewart,* owners of vacant unimproved land condemned by the state sought interest running from the date eminent domain proceedings were instituted to the date of payment of compensation. We held that a landowner loses the economic advantages of ownership from the moment an eminent domain action is initiated because the value of the condemned property is determined as of that date by statute. *Id.,* at 1245–47. In reaching this conclusion, we observed that unimproved property is only a desirable *economic asset* if (1) the property may appreciate in value; and (2) the owner is afforded the opportunity to improve the property toward whatever end he might desire. *Id.,* at 1247.

12. *Cf. Burrows v. City of Keene,* 121 N.H. 590, 432 A.2d 15 (1981). In *Burrows,* a city wanted to acquire part of a landowner's property for park land and made several offers which the landowner rejected. The city then rezoned the area, designating part of the landowner's property as an "open-space" zone which precluded any improvements by the landowner. The New Hampshire Supreme Court held this rezoning constituted a "taking" because it unreasonably precluded all beneficial use of the property. *See also Peacock v. County of Sacramento,* 271

Cal.App.2d 845, 77 Cal.Rptr. 391 (1969) (adoption of severely restrictive zoning ordinance prohibiting both structures and vegetation constituted a taking).

13. SD & R's interest in the approved water and sewer districts does not constitute private property subject to the protections of the Takings Clause. Even when assessments have been paid and improvements constructed, courts have generally held that property owners do not have vested rights in municipal improvements. *See LaSalle Nat'l Bank & Trust Co. v. City of Chicago,* 128 Ill.App.3d 656, 83 Ill.Dec. 819, 470 N.E.2d 1239 (1984) (holding that revocation of a bank's sewer connection entailed no appropriation of the bank's sewers or land and thus did not constitute a taking of private property for public use; court emphasized that the bank had no vested right to sewer connection). *See generally* 2 Nichols, *The Law of Eminent Domain* § 6.13 at 6–83 (1990) (weight of authority indicates that landowners who have been assessed for the construction of municipal improvements have no greater right in the improvements than any other taxpayers).

proximately $634,000 to construct Altoona Drive. If SD & R had borne this cost alone, its per lot development cost would have skyrocketed to approximately $89,000. Given that the value of comparable improved lots in the area ranged between $45,000 and $37,000 in 1985, SD & R would clearly have had no financial incentive to develop its property.

■ The dissent skates over this fact in concluding that SD & R's investment in the property represents the type of "reasonable investment" which should be protected by the Takings Clause. SD & R's investment (i.e., obtaining the water and sewer districts, purchasing five additional lots and obtaining preliminary approval of its subdivision plan) could not bear fruit without the participation of area landowners in the road improvement district. SD & R gambled that the road improvement district would be approved and they lost this gamble, in part, because A–C Investments opted to sell its 12 acre parcel to the municipality instead of proceeding with its own development plans. To conclude, as does the dissent, that the municipality's purchase of property in the area and its decision not to participate in the road district constitutes a taking of SD & R's property would imply that the municipality assumed a duty to participate in the road improvement district when it acquired the area property. In the normal course of events,

neither the municipality nor a private landowner has any obligation to vote in favor of a proposed improvement district. *See* Executive Directive 8 (providing special procedures but still allowing the municipality to vote in opposition to the majority of private landowners). In the absence of a viable estoppel claim, no legal principle requires the municipality to compensate SD & R simply because it exercised its right as a majority landowner not to participate in the road improvement district. *See supra* n. 8.

Although SD & R may have hoped and expected to obtain the road improvement district, its expectation was always contingent on the agreement of the other landowners in the assessment area. For this reason, we conclude that development of SD & R's lots never progressed beyond the planning stage. SD & R's acquisition of these lots and subsequent petitions for improvement districts do not evidence a reasonable investment-backed expectation, but rather, a business gamble.[14] *See, e.g., Habersham at Northridge v. Fulton County, Georgia,* 632 F.Supp. 815, 823–24 (N.D.Ga. 1985) (holding that the county board's refusal to change a property's zoning from residential to commercial did not constitute a taking), *aff'd,* 791 F.2d 170 (11th Cir. 1986).

**14.** *Cf. City of Los Angeles v. Tilem,* 142 Cal. App.3d 694, 191 Cal.Rptr. 229, 235 (1983). In *Tilem,* the city proposed a road widening project which required taking a ten-foot strip along Tilem's property (Tilem's property consisted of two lots—one improved, one unimproved). Although the city took no concrete steps to implement this plan, four years later when Tilem made preliminary plans to move a building on the unimproved lot, the city informed Tilem that once the ten-foot strip was condemned, Tilem would no longer be able to conform to the city setback requirements. Thus Tilem did not pursue this project. Tilem's ability to market the improved lot was also substantially affected because the city planned to assess Tilem's property for the full cost of the road widening project (the city's cost projections for this project ranged from $60,000 to $200,000). The California Court of Appeals held that Tilem was entitled to damages for inverse condemnation because the city's actions had made it impossible for Tilem to develop the unimproved lot and

because Tilem's ability to market the improved lot was significantly impaired. *Id.,* 191 Cal. Rptr. at 233. The court of appeals observed:

> It seems obvious to us that formidable obstacles were placed in Tilem's path in the use of his land. This was not vacant real estate owned and held as a speculative business venture but land that was intended to be developed from the time it was purchased. *Once that development became feasible, it was prevented by the City's actions.* The proposed Media Drive widening project, and the activities undertaken by the City in relation thereto, had a clear and measurable effect upon Tilem's property rights.

*Id.,* 191 Cal.Rptr. at 235 (emphasis added). In the case at bar, development was *never* "feasible"—it was always contingent on the construction of the necessary improvements and the construction of those improvements was itself contingent on the cooperation of adjoining landowners.

#### 4. *Governmental Interest*

SD & R argues that the municipality's actions constitute an improper use of municipal authority to avoid the consequences of its own poor planning. We disagree. We have previously held that the financial stability of a governing body is a legitimate governmental purpose in the regulatory takings arena. *Arctic Slope*, 834 P.2d at 143. In cases such as this, the municipality retains the option to change its position for fiscal reasons after improvement districts are approved.[15]

### IV. *CONCLUSION*

On the record presented, SD & R has failed to establish, as a matter of law, that it is entitled to compensation under the Alaska constitution. The municipality has not deprived SD & R of any "vested right" or directly constrained its use of its property in any way. We also conclude that SD & R has not been deprived of any reasonable investment-backed expectations. The municipality declined to participate in the improvement districts because these improvements were not necessary for park use and they would have constituted a waste of municipal resources. To find a taking in a case such as this, where a governing body's acquisition and planned use of its property indirectly makes a neighboring landowner's development plan

economically infeasible would create major problems for urban planning. *Cf. Ehrlander*, 797 P.2d at 636 n. 6 ("If a governmental entity ... were held subject to a claim for inverse condemnation merely because a parcel of land was designated for potential public use ... the process of community planning would ... grind to a halt....") (quoting *Selby Realty Co. v. City of San Buenaventura*, 10 Cal.3d 110, 109 Cal. Rptr. 799, 514 P.2d 111, 117 (1973)). Because SD & R's speculative development plans do not merit constitutional protection as a matter of law, we reverse the trial court's grant of summary judgment in favor of SD & R and remand this case for entry of summary judgment in favor of the municipality.

REVERSED and REMANDED.

COMPTON, J., dissents.

COMPTON, Justice, dissenting.

The superior court found that the conduct of the Municipality of Anchorage (municipality) resulted in a diminution of SD & R's rights and attributes of ownership.[1] The court stated that the municipality's conduct made "the development of plaintiffs' property *economically infeasible*," and that it resulted "in *denial* to the minority property owners the *economic viable use* of their land."[2] (Emphasis added).

---

**15.** SD & R focuses at length on the municipality's failure to conform with Executive Directive 8 (requiring the municipality to follow a special procedure whenever it votes in opposition to the majority of private landowners in assessment balloting). It is undisputed that the municipality did not follow this procedure when it voted to abolish the approved water and sewer improvement districts. However, to the extent that any of the municipality's actions was improper or beyond the scope of its authority, the proper vehicle to challenge such action is via a motion for mandamus. *See, e.g., HFH, Ltd. v. Superior Court of Los Angeles County*, 15 Cal.3d 508, 125 Cal.Rptr. 365, 372–73, 542 P.2d 237, 244–45 (1975) (recognizing mandate action to invalidate zoning ordinance; mandate action permits a party suffering from improper governmental action to correct administrative abuse).

**1.** The Municipality's actions resulted in SD & R's property becoming an "island." It is surrounded on three sides by municipal park land and on the fourth by a separate subdivision, of

which SDR's property cannot become a part. Thus the property is isolated from any other improvement district, destroying its economic viability by making its development economically infeasible.

**2.** The court trivializes Superior Court Judge Rene Gonzalez's unchallenged findings when it states only that the superior court "found that the municipality's actions had an adverse impact on the value of SD & R's property." Opinion at 5. The superior court made detailed findings, including that the actions of the Municipality left "the plaintiffs as the only private land owners in the area having to pay the full costs for sewer, water and road improvements." As a result of these actions, SD & R's development costs "would far exceed the fair market value of the lots as improved. The per lot development cost would exceed $100,000.00 on lots that would have a fair market value as improved of approximately $50,000.00."

These findings are consistent with the evidence, which put the development costs at $89,-

Thus, this is not a case in which the property owner claims that he or she would have made more but for the government's action, and asks to be compensated for the difference. Nor is there any argument over what would be the fair market value of the property depending on the highest and best use to which it could be put. The property no longer has *any economically viable use.*

I agree that the municipality has a legitimate governmental interest in maintaining its own financial stability. In fact, the municipality not only has the authority to avoid the consequences of its own poor planning, it has a duty to do so. It is thus understandable that the municipality declined to participate in the improvement districts, because these improvements were not necessary for park use and might have constituted a waste of municipal resources. But this conclusion is only the beginning of a takings analysis.

The Takings Clause of the Fifth Amendment to the United States Constitution is " 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 123, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)).

Whether traced to a principle that society simply should not exploit individuals in order to achieve its goals, or to an idea that such exploitation causes too much dissatisfaction from a strictly utilitarian point of view unless it is brought under control, the just compensation requirement appears to express a limit on government's power to isolate particular individuals for sacrifice to the general good.

Laurence H. Tribe, *American Constitutional Law* § 9–6, at 605 (2d ed. 1988).

The United States Supreme Court treats legitimate government action which denies all economically beneficial or productive use of land as a *per se* taking. *Lucas v. South Carolina Coastal Council,* —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). In *Lucas* the Court stated:

Surely, at least, in the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted, it is less realistic to indulge our usual assumption that the legislature is simply "adjusting the benefits and burdens of economic life" in a manner that secures an "average reciprocity of advantage" to everyone concerned. And the *functional* basis for permitting the government, by regulation, to affect property values without compensation—that "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law,"—does not apply to the relatively rare situations where the government has deprived a landowner of all economically beneficial uses.

*Id.,* at ——, 112 S.Ct. at 2894 (citations omitted).

The court recognizes the rule of *Lucas* and accepts that it is economically infeasible for SD & R to develop its property. Nevertheless, the court declines, for no stated reason, to explain why the *Lucas per se* rule does not apply.[3] In my view,

---

182, $110,966, or $121,146 per lot, depending on whether all costs (sewer, water and road) or some costs were to be included, and the date costs were to be determined. The average purchase price per lot was $27,500. Thus the cost of an improved lot ranged from $116,682 to $148,746. The assessed valuation of an unimproved lot was $20,300 in 1986. The assessed valuation of a comparable improved lot was $45,000. It was $37,000 in 1987, the date the average cost per lot was highest.

**3.** The court's "conclusion" that the *per se* categories of *Lucas* have no application to this case

"because the municipality neither sought to appropriate SD & R's property nor enacted a regulation constraining SD & R's use of its property in any way," Opinion at 557, n. 7, ignores the superior court's findings that the Municipality's actions "resulted in making the development of plaintiffs' property economically infeasible." The *Lucas* court stated:

We think, in short, that there are good reasons for our frequently expressed belief that when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good,

the *Lucas* rule applies to this case, and requires the municipality to compensate SD & R for the deprivation of the economically beneficial use of SD & R's land. Because of this conclusion, I would find it unnecessary to reach the issue of the "broader protection" afforded by article I, section 18 of the Alaska Constitution. *State v. Hammer,* 550 P.2d 820, 824 (Alaska 1976).

However, since the court finds it necessary to analyze this case under the Alaska Constitution, which until today has afforded property owners *broader* protection than that conferred by the Fifth Amendment to the United States Constitution, I am compelled to respond. In my view, the court misapplies the "ad hoc" fact-based standard of *State, Dep't of Natural Resources v. Arctic Slope Regional Corp.,* 834 P.2d 134, 138 (Alaska 1991).

In *Arctic Slope* we identified three factors which should be considered in determining whether governmental action constitutes a taking: (1) the character of the governmental action, (2) its economic impact, and (3) its interference with reasonable investment-backed expectations. *Id.,* at 139 (citing *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984)).

The character of government action is relevant because:

> A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. In this case the interference resulted from the municipality's program of acquiring park land and its efforts to minimize costs associated with the acquisitions. The municipality's actions were intended to adjust the benefits and burdens of economic life to promote the common good.[4]

---

that is, to leave his property economically idle, he has suffered a taking.
*Lucas,* —— U.S. at ——, 112 S.Ct. at 2895.

**4.** The court doubts even this assertion, suggesting that the municipality acted primarily as a private landowner. The court notes that the case does not involve "an exercise of regulatory authority by the municipality. Rather, it primarily entails action by the municipality as an owner of neighboring property voting to repeal an improvement district." Opinion at 558, n. 8. The court goes on to state: "Where a governmental agency merely takes action which is substantially similar to that which could be taken by a private landowner, it seems highly doubtful that a colorable taking claim can be established."

This is not a case in which the government is acting as a private landowner. This case is about a municipal government acquiring land for a city park. Private landowners do not acquire land to create city parks. Private landowners do not (and, in fact, cannot) create or abolish improvement districts, only the Municipal Assembly can do so. Anchorage Municipal Code 19.20.130 (After the public hearing is closed, the Assembly shall adopt an ordinance determining either to proceed or not to proceed with the proposed improvement.). The acquisition of land and the creation of a city park is "primarily" and solely an exercise of municipal authority.

Furthermore, the court's statement that a taking claim cannot be established when the government acts like a private landowner is contrary to our precedents. In *Bakke v. State,* 744 P.2d 655 (Alaska 1987), a state logging operation was at issue.

> [I]t is clear that if the State's 1964 logging operation was a proximate cause of the Bakkes' injury, the State has deprived them of the economic benefits of ownership even though it may not have intended to do so, and even though its 1964 logging operation did not directly and immediately affect the Bakkes' land. First, it is not disputed that the logging operation was for a public purpose. Second, the Bakkes suffered injury and thus were denied the economic benefits of ownership.

*Id.,* at 657. We stated that we were persuaded by the approach taken in *Albers v. County of Los Angeles,* 62 Cal.2d 250, 42 Cal.Rptr. 89, 398 P.2d 129 (1965), which found an inverse condemnation for property damaged by construction which caused a land slide "[a]lthough it was conceded that the road was not negligently built." *Bakke,* 744 P.2d at 657. In *State v. Doyle,* 735 P.2d 733 (Alaska 1987), we affirmed a finding of inverse condemnation brought by landowners for a decrease in the appreciation of their property values caused by noise attributable to the operation of a new airport runway. *Id.,* at 738. We did so despite the fact that the landowners also sued the government for trespass and nuisance, actions typically taken against private landowners. *Id.,* at 741.

While property owners can only recover from a private landowner on theories of trespass or nuisance, the government is held to a different

Thus, while a taking might be less readily found than had the municipality physically interfered with the property, absence of physical interference does not preclude finding an unconstitutional taking.

As for the second factor, the economic impact of the government's action, the court concedes, as it must, that because of the municipality's actions "it has now become economically infeasible for SD & R to develop its land...." Opinion at 559. The municipality's actions denied SD & R all viable economic use of the property.

I agree that under the court's analysis the "real question presented by this case is whether SD & R's expectations concerning its development plans were reasonable and whether those expectations should be afforded constitutional protection." Opinion at 559. However, I disagree with the court's understanding of the reasonableness standard, and with its conclusion that SD & R's expectations were not reasonable in this case.

First, the court confuses the reasonableness of a property owner's expectations with the scope of the owner's vested rights.

It is true there are no "vested" rights in sewer lines, but that does not answer the question whether SD & R had reasonable investment-backed expectations in the development of its property.[5] In *Lucas*, the property owner had no "vested" rights in the zoning laws, yet the court found a *per se* taking when the state's actions denied Lucas the viable economic use of his land. It makes no sense to require expectations to become vested in order to be protected. Once an expectation is vested it becomes a right and is no longer an expectation at all.

Second, the court misinterprets our decision in *Arctic Slope* when it states that, to find a compensable taking, "we would have to conclude that the Assembly's approval of the water and sewer districts constituted some kind of 'guarantee' or 'express promise' that the road improvement district providing access to SD & R's property would eventually be approved and constructed." Opinion at 559. *Arctic Slope* requires that a property owner's expectations be reasonable and investment-backed, not that the law "guarantee" those expectations.[6]

standard. The Alaska Constitution provides that "Private property shall not be taken or damaged for public use without just compensation." Alaska Const. art. I, § 18. This clause is liberally interpreted in favor of the property owner, *Alsop v. State*, 586 P.2d 1236, 1239 & n. 7 (Alaska 1978), and protects the individual from being forced to bear the burden of a public project.

"The tendency under our system is too often to sacrifice the individual to the community; and it seems very difficult in reason to show why the State should not pay for property which it destroys or impairs the value, as well as for what it physically takes."

*Bakke*, 744 P.2d at 657 (quoting *Albers*, 42 Cal. Rptr. at 97, 398 P.2d at 137).

5. Contrary to the court's suggestions, this case is not about whether there was a taking of SD & R's interest (or lack thereof) in approved water and sewer districts. Rather, it is about the deprivation of one of the most essential aspects of property ownership—the right to use and develop land in an economically beneficial manner. The term "property"

as used in the Takings Clause includes the entire "group of rights inhering in the citizen's [ownership]." It is not used in the "vulgar and untechnical sense of the physical thing with respect to which the citizen exercises

rights recognized by law. [Instead, it] denote[s] the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it.... The constitutional provision is addressed to every sort of interest the citizen may possess." *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 82 n. 6, 100 S.Ct. 2035, 2041 n. 6, 64 L.Ed.2d 741 (1980) (quoting *United States v. General Motors Corp.*, 323 U.S. 373, 377–78, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945)). In *Lucas* the Supreme Court recognized the importance of the right to productive and economically beneficial use of land: "'[F]or what is the land but the profits thereof?'" *Lucas*, —— U.S. at ——, 112 S.Ct. at 2894 (quoting 1 E. Coke, *Institutes* ch. 1, § 1 (1st Am. ed. 1812)).

6. In *Arctic Slope* we examined the reasonableness of Chevron's assumptions that the Department of Natural Resources would not use well data for internal departmental purposes. We noted that (1) neither Alaska's oil conservation act nor its regulations contained any guarantee that the data would not be used, and (2) "companies were 'on notice' that DNR in fact used confidential data ... in its decision making on state oil and gas leasing." *Arctic Slope*, 834 P.2d at 140. We also stated that "[n]o matter how reasonable or unreasonable the companies' expectations may have been, we are not persuaded that they were 'investment-backed.'" *Id.*, at 141.

In fact, the record does not support the court's characterization of SD & R's development expectations as "never progress[ing] beyond the planning stage" or a "business gamble." The superior court found that the "Plaintiffs purchased the lots for purposes of development and resale."[7] SD & R's development progressed beyond the planning stage as they actually invested in the property. As in *City of Los Angeles v. Tilem*, 142 Cal.App.3d 694, 191 Cal.Rptr. 229, 235 (1983), SD & R's property was not vacant real estate owned and held as a speculative business venture, but land that was intended to be developed from the time it was purchased.[8] Compare the activities of SD & R, purchasing property, petitioning and gaining improvement districts, purchasing more property and resubdividing to form uniform lots for development, with the activity of plaintiff in *Habersham at Northridge v. Fulton County, Georgia*, 632 F.Supp. 815, 823–24 (N.D.Ga.1985):

> Plaintiff put up $237,000 for property which the Fulton County Board of Commissioners had twice refused to rezone and which, by its own expert's account, was worth no more than $50,000 at the time of the purchase. If the property

was rezoned as sought, the gamble would pay off because the plaintiff, after putting up an additional $2,000,000 [$2 million dollars as part of the original purchase price would only be paid if the property was rezoned], would own property worth $6,800,000. If, however, the property was not rezoned, the plaintiff could simply walk away from the deal, losing little more than what it cost to place its bet.

By characterizing SD & R's development of its property as a business gamble,[9] similar to that of the plaintiff in *Habersham* and unworthy of protection as part of a property owner's bundle of rights, the court casts doubt on any business investment which is not a 100% certainty.[10] SD & R's purchase of property for the purpose of development can be only fairly called an investment.

The reasonableness of SD & R's investment-backed plans to develop its property is based in part on the improvement districts. The Anchorage Municipal Code allows re-balloting of a previously approved improvement district only if the costs rise by more than 10% between the time of Assembly approval and eventual construction. AMC 19.30.070. This requirement, which Judge Gonzalez found the municipal-

---

7. See *infra* note 8.

8. The court's attempt to distinguish *Tilem* because use of the *Tilem* property became "feasible" is unpersuasive. The development in *Tilem* became "feasible" for Tilem when he found a suitable building to move onto the property. The court's assertion that "SD & R still could not have feasibly developed its property unless the municipality also participated in the road improvement district" is simply untrue. SD & R purchased unimproved lots between 1981 and 1983. SD & R petitioned for and created, with the approval of the Anchorage Municipal Assembly, water and sewer improvement districts in May 1984. At the suggestion of the Municipality, SD & R postponed its petition for a road improvement district in an attempt to secure partial state funding. In March 1985 neighboring property owners petitioned and received from the Municipality preliminary approval to subdivide their parcel into approximately 87 lots. During the summer of 1985, SD & R purchased five additional lots and applied for and received preliminary approval for the re-subdivision of its property. In May 1986, upon learning that no state funds were available for the road improvement, SD & R petitioned for a

road improvement district. During this entire period, ongoing development of SD & R's property was not only feasible, it was a reasonable investment which SD & R was actively pursuing. Development of SD & R's property remained reasonable and feasible, *without municipal participation*, up until the summer of 1986. At that time the Municipality undertook the extension of the Gladys Wood Memorial Park, purchased the 12–acre parcel, and left SD & R as the only private property owner in the improvement districts.

9. The court never identifies just what activities on SD & R's part it has chosen to denominate as a "business gamble."

10. The court accuses the dissent of "skat[ing]" over the fact that SD & R's investment was not 100% certain. However, the court fails to address the questions presented, first, whether SD & R's expectations went beyond the planning stage and became investment-backed, and second, whether its investment was reasonable. Until today there has been no requirement that investment-backed expectations also be 100% guaranteed to warrant protection.

ity *had failed to meet,* allows investors to rely on the improvement districts without fear of having an improvement district dissolved simply because of a change of plans by neighboring landowners.

Municipal Executive Directive 8 further protects private landowners from the possibility of differing priorities between public and private interest in assessment balloting by requiring the municipality to follow a special procedure whenever it votes in opposition to the majority of private landowners in assessment balloting.[11] It is undisputed that the municipality did not follow this procedure when it voted to abolish the approved water and sewer districts and decided not to support the road improvement district. It is reasonable for private property owners to assume the municipality will follow its own regulations and directives.

SD & R made the type of reasonable investment that should be protected by the Takings Clause. While the municipality has the right and the duty to minimize waste of municipal resources, in this case "in all fairness and justice, [the cost] should be borne by the public as a whole." *Penn Central,* 438 U.S. at 123, 98 S.Ct. at 2659. SD & R established that there are no disputed issues of material fact and that they are entitled to judgment as a matter of law. Because I would affirm the superior court's grant of summary judgment, I dissent.

---

**11.** Unlike a private property owner, Executive Directive 8 "intends" that the Municipality will vote with the majority of private landowners, and only oppose the majority preference in "special circumstances."

 2. Petition Process and Voting Procedures for Municipal Property:

 A. Petitions of special interest to private property owners: When petitions are circulated to benefit private property owners it is *intended* that the majority preference of the owners, less the share for any Municipal property, shall determine the outcome of the petition....

 B. Contingency for special circumstances: If a petition is circulated and there exist *special circumstances* that would *require* the Municipality to oppose the majority preference of the owners of private property, the Department will submit an Assembly Memorandum to the Mayor, describing the *special circumstances* and recommending that the administration be authorized to sign the petition in accord with the *special circumstances....*

Executive Directive 8 (emphasis added).