Lorraine **BALOUGH** and Jerome
Stempak, Appellants,

v.

**FAIRBANKS NORTH STAR
BOROUGH, Appellee.**

No. S–8141.

Supreme Court of Alaska.

Jan. 28, 2000.

Rehearing Denied May 30, 2000.

Robert John, Law. Office of Robert John, Fairbanks, for Appellants.

Cynthia M. Klepaski, Assistant Borough Attorney, and Ardith Lynch, Borough Attorney, Fairbanks, for Appellee.

Before MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

*OPINION*

COMPTON, Justice.

## I. *INTRODUCTION*

Lorraine Balough and Jerome Stempak (collectively "Balough") appeal a superior court judgment affirming the Fairbanks Board of Adjustment's (BOA) decision denying Balough's junkyard "nonconforming use" status.

Balough also appeals the superior court's judgment granting to the Fairbanks North Star Borough (FNSB) summary judgment on all of Balough's remaining claims.

We conclude that the judgment of the superior court affirming the decision of the BOA must be reversed and remanded to the BOA for further proceedings. We affirm the judgment dismissing the direct civil action.

## II. *FACTS AND PROCEEDINGS*

### A. *Facts*

Lorraine Balough and Jerome Stempak own property in the Goldstream Valley in the Fairbanks North Star Borough.[1] When Balough purchased the property it was zoned as General Use—1 (GU–1).[2] Since 1990 Lorraine and her son Michael have used a portion of the property as a junkyard, pursuant to a license issued to them by FNSB. Junkyards are a "permitted use" in GU–1 zones.[3] Balough asserts that her property is not a junkyard, but rather a recycling center. For the purposes of this opinion, we refer to Balough's property as a junkyard.

In August 1992 FNSB Code Enforcement Officer Fred B. Rohn notified Balough that she was in violation of FNSBCO 8.16.030 [4]

---

1. Throughout this opinion, we refer to the area rezoned as Nugget Loop. Nugget Loop is one of the main roads in the Goldstream Valley.

2. "[The General Use] district is intended to be located in rural areas where community sewer and water systems are unavailable." Fairbanks North Star Borough Code of Ordinances (FNSBCO) 18.44.010.

3. A "permitted use" is defined as "any use of a building or premises which is or may be lawfully established in a particular zoning district, provided it conforms with all requirements and regulations of this title for the zoning district in which such use is or is proposed to be located."

FNSBCO 18.06.010(A)(155); *see also* FNSBCO 18.44.020.

4. FNSBCO 8.16.030 provides:

No junkyard or auto wrecking yard shall be established or continued unless such junkyard or auto wrecking yard is completely obscured from view of any traveled or occupied location within five hundred feet from any boundary of the junkyard or auto wrecking yard, within a building or within a continuous solid fence no less than eight feet in height. The fence may be of evergreen planting or other natural planting or topography of sufficient density to provide a year-round screen.

because her junkyard was not surrounded by a fence, nor was it completely obscured from view. Balough immediately began construction of a wood slab fence. A September snowfall forced Balough to cease construction of the fence before it was completed. According to Balough, she had expended more than $17,000 to bring the junkyard into compliance before the early snowfall interrupted her work. At that time temporary measures were taken at the suggestion of Mr. Rohn to get Balough through the winter. She invited Mr. Rohn to come out to her property and view the partially completed fence. He viewed the property on a number of occasions.

In September 1992 Balough's neighbors Hunter and Carole Judkins filed a rezoning application with the FNSB Department of Community Planning (Department).[5] The Judkins requested that the north side of Nugget Loop be changed from GU–1 to Rural Residential (RR).[6] The Judkins requested that a total of 75.56 acres be rezoned. In their rezoning application, the Judkins stated that the GU–1 zoning had not been a problem until

one neighbor allowed a junk yard to move in at the site of the children's elementary school bus stop.... We fear a potential tragedy in our neighborhood with abandoned vehicles and appliances so accessible to young children seeking an adventure.

The Judkins concluded their request by stating that, "[w]e certainly hope that rezoning to Rural Residential will be implemented without delay, to the benefit of the many families and landowners of the Nugget Loop neighborhood."

The Department recommended that the Commission approve the requested zone change. In a Staff Report addressed to the Commission, the Department made the following findings of fact in support of its recommendation:

1. This rezone does conform to the Comprehensive Plan in that:
 a. The area is designated Outskirt Preferred Residential.
 b. The rezone is an attempt to maintain a healthy existing residential area and ensure that this area has uses compatible with the existing, predominately residential use.
 c. The rezone will help to ensure that this existing residential area is infilled with only compatible residential development.
2. This request will not jeopardize the public health, safety, and welfare.

The Commission notified Nugget Loop residents that there would be a public hearing held on November 20, 1992, regarding the Judkins' rezoning request. The notification provided a space for comments and the opportunity to attach a letter if a property owner was unable to attend the public hearing; Balough attached such a letter. In her letter, Balough stated that, "Mr. Dick Randolph ... who owns the intervening vacant lot between our two properties ... is not interested in rezoning and [told her] that he would be happy to verify that by telephone." Balough requested that when the Commission defines the rezoning, it exempt "the triangular portion that includes the three pieces of property belonging to Dick Randolph, Dr. Stempak and myself, and my residence."

Numerous property owners, most of whom favored the rezoning, testified at the public hearing before the Commission. Robert

FNSBCO 8.16.010(A) defines "Junk" as: "[D]ismantled or wrecked automobiles, aircraft, motor vehicles or machinery, mobile homes or trailers; used appliances or furniture; scrap building material, metals, rubber, paper, plastic, or other scrap materials."

5. The procedure for rezoning within the FNSB is as follows: The person seeking a rezoning must submit an application to the Department of Community Planning. *See* FNSBCO 18.52.010(C). The Department forwards the request to the Planning Commission (Commission). *See*

FNSBCO 18.52.010(A). The Commission "[m]ake[s] recommendations on requests for rezoning ... and transmit[s] the same to the borough assembly." FNSBCO 18.52.020(B). The borough assembly makes the "determinations on requests for rezoning." FNSBCO 18.52.040(A).

6. A Rural Residential district "is intended for low density residential development and other compatible uses in areas where community sewer and water systems may or may not be available." FNSBCO 18.20.010.

Hutchison, Balough's husband, spoke against the rezoning. He stated that he and Balough preferred to call the junkyard a "recycling area." Further, Hutchison stated that "[a]s far as the recycling area is concerned, that is a temporary thing, but we do have it fenced." Hutchison did not request that the Commission exclude his property from the rezoning.

Tina Zimmerman, Planner II for the Division of Planning and Zoning, noted at the hearing that

> [a]ny legal existing use . . . that is legally existing when the rezone takes place will be grandfathered. But the junkyard in question, as of today, is not in compliance according to the code enforcement officer. That would have to be brought into compliance and be a legally existing use to be grandfathered if the Assembly adopts the rezone.

The Commission voted eight to zero to recommend that the Borough Assembly approve the rezoning.

On January 14, 1993, the FNSB Assembly held a regular assembly meeting to vote on the proposed rezoning. Hutchison spoke before the Assembly. He stated that he had "no objection to the rezone as such, but [he] request[ed] that [Balough's and his] property there be exempted from this rezoning and that [their] businesses which [they] have had in effect on [their] property be granted grandfather rights." Hutchison also requested that Randolph's property be exempt from the rezoning, although Randolph did not testify before the Assembly. Numerous Nugget Loop residents urged the Assembly to rezone the seventy-five acres at issue.

Rex A. Nutter, Director of the Department of Community Planning, presented a staff report to the Assembly. Nutter recommended that Balough's property not be exempt from the rezone. He also stated that "[a]ny use that is lawfully established at the time of the effective date of the rezone may continue in accordance with the non-conform-

ing use portion, Title 18." Furthermore, when asked whether the junkyard was in compliance, Nutter responded that the junkyard was still under evaluation, but that it was the Department's "tentative position that the junkyard is in compliance with Title 8." He testified that

> [The Department of Community Planning] code enforcement officer was out there this week and as recent as today. In their reading of the code which is Title 8, simply states that [the junkyard] is required to be screened from view. And, for our purposes, that property is—the garbage, the trash, the vehicles, whatever it is that's on the property, is screened from view traveled way or adjoining property.

The Assembly approved the rezoning, with a vote of eleven to zero. Balough's property was not exempted. The rezoning was reduced to Ordinance No. 92–072. The ordinance became effective at 5:00 p.m. on January 15, 1993.

On January 28 Nutter, in his capacity as the Department of Community Planning Director, sent Balough notification that her lot "does have 'Grandfather Rights' under Chapter 18.56.000,[7] Nonconforming (Grandfathered) Uses and Lots." On February 4 the Judkins sent a letter to the Assembly, signed by forty Nugget Loop residents, contesting the Planning and Zoning Commission's grant of grandfather rights to Balough. The Judkins asserted that Balough's junkyard was not in compliance with FNSBCO 8.16.030 because the junkyard was not completely obscured from view, and because one third of the fence surrounding the junkyard was less than eight feet high. The Judkins and the neighbors who signed the letter asked the Assembly to "reverse the decision of the planning and zoning commission and deny grandfather rights to the junkyard due to it's [sic] non-compliance [with] ordinance regulations."

---

7. FNSBCO 18.56.020 provides:

Any nonconforming building, structure, use or lot which existed lawfully prior to the effective date of the ordinance codified in this title or any lawful building, structure, use or lot which has become nonconforming upon the adoption of the ordinance codified in this title or any subsequent amendment thereto, may be continued, subject to the restrictions in this chapter. Any change in ownership of such a building, structure, use or lot does not void grandfather rights.

Residents of Nugget Loop were notified that the FNSB Assembly, sitting as the Board of Adjustment (BOA),[8] would hold a public hearing on March 25, 1993, to hear an appeal filed by Philip Schad Jr., on behalf of Carol and Hunter Judkins, regarding the decision to grant Balough grandfather rights, pursuant to FNSBCO 18.56.000, to operate her junkyard. The notification stated that "[a]ll interested persons shall be given the opportunity to present testimony and exhibits. All exhibits used will become a part of the record, and must be submitted to the Borough Clerk when exhibit is introduced." At the appeal before the BOA, all those who testified were sworn in.

Hunter Judkins testified first. The crux of his testimony was that Balough should not have been granted grandfather rights because the junkyard was not in compliance with either one of the two requirements of FNSBCO 8.16.030.[9] Carole Judkins then testified and introduced photographs of the junkyard taken in February and March 1993.

Nutter testified on behalf of the Commission. He stated that "these people met the intent of the Code and if at such time since that rezone they fall out of compliance through losing their fence or things blowing away, they go in violation, they do not lose their grandfather rights." Nutter further testified that he had not measured the fence when he inspected it for compliance, because he had been primarily concerned with whether the junkyard was obscured from view. He had concluded that the Balough's junkyard was obscured from view, and so it met the ordinance requirements. Nutter also testified that he had not walked around the perimeter of the junkyard. Hutchison appeared as a witness for the Commission. He testified that on the day the Borough inspect-ed his property, the fence was eight feet high. Balough then testified that on January 14, 1993, the fence was up and it was sight-obscuring all of the way around the junkyard.

After Judkins and Nutter gave their closing remarks, the BOA discussed whether the junkyard met the requirements of FNSBCO 8.16.030. Statements from BOA members included: "The fence hasn't met two criteria. It has to be 8′ tall and it has to completely block your view." "There's nothing from the Planning Commission or the owners of the property that shows any documentary evidence that there was a continuous fence." The BOA voted seven to four in favor of granting the Judkins' appeal, thereby reversing the Commission's grant of grandfather rights to Balough.

On April 22 the Assembly, sitting as the BOA, held a closed session and voted to rescind its action granting the Judkins' appeal. They "remand[ed] the appeal back to the Planning Department to provide measurements of the fence as of January 15 and to also provide the BOA with copies of the November pictures and the video tape."

The BOA met in September to consider the new evidence from the Planning Department,[10] viewing a video from January 18, and pictures taken on November 2 and 10, January 13, and April 22. Balough's attorney Robert John addressed the BOA, arguing that the FNSB's regulations governing recycling centers should apply because Balough was operating a recycling center, not a junkyard. John further argued that Balough "was in substantial compliance and is making her best faith efforts in reliance on representations from members of the Borough to try and get this thing into compliance." Balough

8. FNSBCO 18.52.030 provides:
 The borough assembly shall be the board of adjustment for decisions regarding land lying outside of any city incorporated in the Fairbanks North Star Borough.... The board of adjustment, or an appeals officer that the board of adjustment may designate, shall hear and decide appeals of planning commission determinations on requests for conditional uses and variances, and of decisions or determinations made by the department of community planning in the enforcement of this title.

9. The two requirements of the statute are (1) junkyard completely obscured from view; or (2) junkyard surrounded by a continuous fence.

10. The BOA also considered an April 8 letter and photographs from Balough's attorney, which raised numerous issues that it had not previously considered. The BOA voted to include the letter and photographs in the agency record.

also testified. After considerable discussion and disagreement among the BOA members, the BOA voted six to five in favor of granting the Judkins' appeal, thereby reversing the Commission and revoking Balough's grandfather rights.

In its findings of fact supporting its decision to deny Balough grandfather rights, the BOA stated that there was

> testimony that the wood fence [had] not been completed on the west and south sides of the junk yard. There was also testimony that the fence is not continuous and solid and that the slab wood construction of the fence does not obscure the contents of the junk yard from view.

Furthermore, the BOA found that

> [o]n January the 15th, 1993, the last day of the former General Use zone, the fence was at least 8 feet tall in some places, but the northwest section was less than 8 feet tall. Further, the fence did not completely obscure the view of the junk yard from the road or from neighboring property.

In October Balough filed a complaint in the superior court against FNSB, requesting declaratory relief, injunctive relief, and damages. Balough's complaint requested both relief from the BOA's decision as well as relief and damages pursuant to 42 U.S.C. § 1983 [11] for violations of her federal and state constitutional rights to due process and equal protection of law, and freedom from the unconstitutional taking of property. The superior court converted all of Balough's claims, except her Section 1983 claims, to an administrative appeal. The court noted that the Section 1983 claims could be mooted out, and deemed it "appropriate to stay those [claims] pending disposition of the ultimate appeal." At the hearing, the court informed Balough's attorney that, if he wanted the

administrative appeal to be a de novo trial, he would have to file a motion so requesting.

### B. The Administrative Appeal

At oral argument on the administrative appeal, the superior court made clear that the appeal was *not* a de novo trial, because the agency record was complete.[12] The court issued a forty-eight page Memorandum Decision and Order, which concluded that "[t]he Board of Adjustment's September 9, 1993, decision denying grandfather rights for appellants' junkyard is affirmed." The following is a synopsis of the court's pertinent findings:

1. "Both the Planning Commission and the Assembly had substantial evidence before them to support approval of rezoning the area from GU–1 to RR."

2. The rezoning action was not arbitrary spot zoning.

3. FNSB did not err in failing to exclude Balough's property from the rezone.

4. The BOA did not err in interpreting FNSBCO 18.56.020 to require the junkyard to be in compliance with the junkyard ordinance in order to obtain grandfather rights, and there was substantial evidence to support the conclusion that the junkyard was not in compliance.

5. FNSB did not deny Balough due process or equal protection or take her property unconstitutionally.

6. Estoppel is not properly raised in this administrative appeal.

7. FNSB is entitled to $2,000 in attorney's fees and $156.50 in costs.

Balough appeals this order.

### C. The Direct Civil Suit

Following its decision in the administrative appeal, the superior court heard oral argu-

---

11. 42 U.S.C. § 1983 provides in part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

12. AS 22.10.020(d) provides in part:
 The superior court has jurisdiction in all matters appealed to it from a subordinate court, or administrative agency when appeal is provided by law. The hearings on appeal from a final order or judgment of a subordinate court or administrative agency . . . shall be on the record unless the superior court, in its discretion, grants a trial de novo, in whole or in part.

ment on Balough's Section 1983 claims. Balough had moved for summary judgment on the vested rights issue and requested a preliminary injunction; FNSB had moved to dismiss all of the claims remaining in Balough's complaint following the court's resolution of the administrative appeal. In a twenty-six page Memorandum Decision and Order, the superior court granted FNSB summary judgment on all remaining counts of the complaint.

The following is a synopsis of the court's pertinent conclusions:

1. Because Balough attached materials outside of the pleading to her memorandum in opposition to FNSB's motion to dismiss, the motion to dismiss will be treated as a motion for summary judgment.

2. Counts I—IV and VI of Balough's complaint state a cause of action under Section 1983.

3. Count V, collateral estoppel, does not state a cause of action under Section 1983, and will not be considered.

4. Section 1983 claims can be barred by collateral estoppel, and "[i]f the issues in the current action are the same as those litigated before the FNSB Assembly, [BOA], and in the administrative appeal, collateral estoppel should apply to preclude Balough from relitigating the issues as part of the Section 1983 claims."

5. In comparing the arguments discussed and rejected in the administrative appeal and the Section 1983 claims in Counts I through IV and Count VI of Balough's complaint, the court found it "clear that there are no remaining questions of law which would be determinative of the Section 1983 claims, [with the possible exception of the vested rights issue]."

6. Balough showed no evidence "of a taking for which [she] would be entitled to compensation under the federal constitution."

7. Balough does not "have a 'vested' property right in either GU–1 zoning or grandfather rights to a use which did not comply with fencing requirements. [Balough is] not entitled to summary judgment on [her] due process claims."

8. Balough did "not have vested property rights that were taken by FNSB."

9. FNSB is entitled to $2,500 in attorney's fees, and $2,623.12 in costs.[13]

The court denied Balough's motion for reconsideration of her due process claim. Balough appeals the court's grant of summary judgment to FNSB, and its denial of her motions for summary judgment and injunctive relief.

## III. *DISCUSSION*

### A. *Introduction*

Balough has identified numerous points on appeal. She appeals (1) the superior court's affirmation of the BOA's decision on numerous grounds, three of which are constitutional; (2) the court's grant of summary judgment to FNSB on all of her Section 1983 claims; (3) the court's decision to bifurcate the administrative appeal and the Section 1983 civil suit; (4) the court's decision not to hear the administrative appeal de novo; and (5) the court's awards of attorney's fees. Balough's brief, however, does not follow a logical breakdown of these issues and instead addresses these points as if they arose out of the same suit. Furthermore, Balough's brief discusses at least six different constitutional claims. Some of these claims were addressed and dismissed as a part of the administrative appeal, while others were redundant Section 1983 claims. Balough does not identify to this court whether she is appealing from the grant of summary judgment to FNSB on the Section 1983 claims, or the affirmation of the BOA's decision to deny her grandfather rights. Additionally, she applies the same standard of review, independent judgment, to all of her claims. We have attempted to break down Balough's argu-

---

**13.** This award of attorney's fees and costs is in addition to those awarded to FNSB after the administrative appeal.

ments into a coherent grouping of issues and discuss each separately.

### B. Standard of Review

When the superior court acts as an intermediate court of appeal, this court does not defer to its decision. We will independently review the merits of the administrative determination.[14] We review the findings of an administrative agency to determine whether they are supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[15] We have previously held that "judicial review of zoning board decisions [both Planning Commission and Board of Adjustment decisions] is narrow[,] and ... a presumption of validity is accorded those decisions."[16] Where the interpretation of a zoning ordinance presents only a question of statutory construction which does not involve agency expertise or the formulation of fundamental policies, we apply the independent judgment standard of review.[17] On the other hand, where the agency's expertise or questions of fundamental policy are involved, an agency's interpretation of a zoning ordinance should be reviewed under the deferential "reasonable basis" standard and should be accepted whenever reasonable.[18] We review the su-

perior court's grant of summary judgment de novo.[19] We will affirm summary judgment if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law.[20] The non-moving party is entitled to have the record reviewed in the light most favorable to it and to have all reasonable inferences drawn in its favor.[21]

We review procedural decisions of the superior court for abuse of discretion.[22] On questions of law, we do not defer to the lower court's decision,[23] but rather "adopt the rule of law which is most persuasive in light of precedent, reason, and policy."[24]

We review a trial court's award of attorney's fees for an abuse of discretion.[25] We will find that a trial court abused its discretion when, after reviewing the whole record, we are left with a definite and firm conviction that the trial court erred in its ruling.[26]

### C. Did the Superior Court Abuse Its Discretion When It Bifurcated Balough's Case into an Administrative Appeal Limited to the Agency Record and a Separate Civil Suit for Balough's Section 1983 Claims?

The superior court bifurcated Balough's Section 1983 claims from her claims relating

---

14. See Handley v. State, Dep't of Revenue, 838 P.2d 1231, 1233 (Alaska 1992).

15. Miller v. ITT Arctic Servs., 577 P.2d 1044, 1046 (Alaska 1978) (citations omitted).

16. South Anchorage Concerned Coalition, Inc. v. Coffey, 862 P.2d 168, 173 (Alaska 1993).

17. See Marlow v. Municipality of Anchorage, 889 P.2d 599, 602 n. 1 (Alaska 1995); Rose v. Commercial Fisheries Entry Comm'n, 647 P.2d 154, 161 (Alaska 1982).

18. Coffey, 862 P.2d at 173 n. 12; Lazy Mountain Land Club v. Matanuska–Susitna Borough Bd. of Adjustment and Appeals, 904 P.2d 373, 385 n. 68 (Alaska 1995).

19. See Nielson v. Benton, 903 P.2d 1049, 1052 (Alaska 1995).

20. See In re Estate of Evans, 901 P.2d 1138, 1140 (Alaska 1995).

21. See Metcalfe Invs., Inc. v. Garrison, 919 P.2d 1356, 1360 (Alaska 1996) (citing Wilson v. Pollet, 416 P.2d 381, 381–84 (Alaska 1966)).

22. See, e.g., Morgan v. Department of Revenue, 813 P.2d 295, 297–98 (Alaska 1991) (reviewing superior court's dismissal of administrative appeal as untimely filed for an abuse of discretion); Sheehan v. University of Alaska, 700 P.2d 1295, 1297 (Alaska 1985) (reviewing superior court's denial of request for an extension of time to file opening brief in an administrative appeal for an abuse of discretion).

23. See Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

24. Id.

25. See Davila v. Davila, 908 P.2d 1027, 1031 (Alaska 1995).

26. See Buster v. Gale, 866 P.2d 837, 846 n. 9 (Alaska 1994) (citations omitted).

to the BOA's decision to deny her grandfather rights. In its decision regarding Balough's administrative appeal, the superior court addressed five issues: (1) whether the Borough Assembly had substantial evidence to support the rezoning; (2) whether the rezoning was unconstitutional spot zoning; (3) whether the Assembly erred in not exempting Balough's property from the rezone; (4) whether the BOA had substantial evidence to revoke Balough's grandfather rights; and (5) whether the Assembly's or BOA's actions violated Balough's rights to due process or equal protection of law, or amounted to an unconstitutional taking. The court explicitly stated that Balough could not raise estoppel in her administrative appeal.

In its decision regarding Balough's direct Section 1983 suit against FNSB, the superior court addressed: (1) whether Balough stated a cause of action under 42 U.S.C. § 1983 in any of the six counts in her complaints; (2) whether the administrative appeal decision should have precluded Balough's Section 1983 claims; (3) whether FNSB was entitled to summary judgment on the merits on all of Balough's remaining claims; and (4) whether Balough was entitled to summary judgment on her claim that she had a vested right in the GU–1 zoning. The superior court declined to address whether FNSB could be estopped from denying Balough grandfather rights, because it concluded that her estoppel claim did not state a cause of action under Section 1983. Balough appeals virtually every determination made by the superior court.

In effect, Balough argues that the superior court abused its discretion when it bifurcated her single civil suit into an administrative appeal and a direct suit encompassing her Section 1983 claims, because "[a]ny direct challenge that [her] Complaint presents to the FNSB Board of Adjustment's decision is intertwined with her accompanying challenges to the constitutionality of the FNSB grandfather-rights and zoning scheme and her civil-rights claims to damages and other relief under 42 U.S.C. § 1983." The court's decision to "bifurcate the administrative-appeal aspects of the case so that part of the case then proceeded under an administrative-

appeal briefing schedule and the other part proceeded under the Civil Rules ... [was] not practical in view of the intertwined nature of the various aspects of the case." Balough urges this court to grant her a full trial de novo on the administrative appeal aspects of her case. If not, Balough argues, she will be denied her right to a jury trial.

### 1. *Trial de novo*

 Balough cannot now assert that the superior court abused its discretion in not granting her a full trial de novo on her administrative appeal claims because she never moved the superior court to do so. The superior court specifically told Balough that if she wanted a trial de novo on her administrative appeal she would have to file a motion so requesting. She never filed such a motion. She did file a motion to supplement the agency record with depositions. In that motion, Balough stated that "the Court has expansive powers to supplement the record and to otherwise conduct a trial *de novo* under Appellant Rule 609. Accordingly, under Appellate Rule 210(c)(3), the Court has broad authority to grant leave to file a supplemental excerpt." Thus, while Balough noted that the superior court could conduct a trial de novo, Balough merely requested that the court "exercise its power and grant [her] leave to supplement the record with the referenced portions of depositions." The court denied Balough's motion, and later sanctioned her for referring to documents not in the agency record in her brief and excerpt of record. At oral argument the court again repeated its refusal to consider evidence outside the agency record, stating that it had "consistently refused" to consider a partial de novo trial in the sense that the court takes a look at new evidence. Because Balough failed to move the superior court to hear her administrative appeal in a de novo trial, and because the court denied all of her motions to supplement the agency record because it believed the record was "complete," we conclude that it was not an abuse of discretion for the superior court to limit Balough's administrative appeal to the agency record.

### 2. Bifurcation of Balough's case

■ The superior court bifurcated the administrative aspects of Balough's case from the Section 1983 claims, because it concluded that "several of the claims [were] functionally administrative appeals because they require the Court to consider the propriety of agency determination, agency in the broadest sense, including the Borough sitting as the Board of Adjustment." The court stayed all proceedings regarding the Section 1983 claims "pending the resolution of the [administrative] appeal."

We have previously held that "bifurcation of a trial is generally within the discretion of a trial court, and a ruling on this issue will not be reversed absent an abuse of that discretion." [27]

■ We have further stated that " '[a] claim is functionally an administrative appeal if it requires the court to consider the propriety of an agency determination' " [28] and that "the key question . . . is whether the claim challenges a prior administrative decision." [29] A BOA decision is an administrative decision.[30] An aspect of Balough's original suit challenged the BOA's decision to revoke her grandfather rights, requiring the court to look at the propriety of the BOA's decision. It was not an abuse of discretion for the court to conclude that part of her suit was functionally an administrative appeal, and to bifurcate her claims accordingly.[31] Furthermore, the superior court did not eliminate Balough's Section 1983 claims when it converted part of her case to an administrative appeal; rather, the court merely stayed those proceedings, and later heard separate oral argument on the Section 1983 claims.

### D. Issues Relating to the Board of Adjustment Proceedings

### 1. Is Balough's property being used as a "junkyard" and therefore subject to the requirements of the junkyard ordinance, FNSBCO 8.16.030?

■ Balough argues that her property is not a junkyard, but a recycling center. Because she is operating a recycling center, Balough asserts, her "property is not subject to the Borough's junkyard ordinance." FNSB argues that regardless of the label Balough puts on the use of her property, it fits the definition of "junkyard."

The FNSBCO defines "junkyard" as "the use of more than five hundred square feet of the yard of any lot or parcel for the storage or keeping of junk." [32] "Junk" is defined as "dismantled or wrecked automobiles, aircraft, motor vehicles or machinery, mobile homes or trailers; used appliances or furniture; scrap building material. . . ." [33] Hunter Judkins stated to the Planning Commission that "there were probably more than 35 junked vehicles, appliances, [and] other things in [Balough's] lot." He had stated similar facts to the BOA. Aside from repeatedly referring to her property as a "recycling center," Balough has never offered any evidence to refute Judkins's assertion that her property is a junkyard, i.e., that there were more than thirty junked cars and other items fitting within the definition of "junk" on her property. We conclude that the BOA had substantial evidence to find that Balough's property is a junkyard and, therefore, is subject to FNSBCO 8.16.030.

### 2. Is Balough required to comply with FNSBCO fencing requirements?

Balough argues that "even if [her] property were a junkyard, the point remains that at

**27.** *Sever v. Alaska Pulp Corp.,* 931 P.2d 354, 361 n. 10 (Alaska 1996).

**28.** *Diedrich v. City of Ketchikan,* 805 P.2d 362, 365 (Alaska 1991) (quoting *Haynes v. State, Commercial Fisheries Entry Comm'n,* 746 P.2d 892, 894 (Alaska 1987)).

**29.** *Id.*

**30.** *See State v. Lundgren Pac. Constr. Co.,* 603 P.2d 889, 892 (Alaska 1979) ("We conclude that

the term 'administrative agency' should be construed broadly to include the board of adjustment since it was in fact performing administrative functions.").

**31.** *See Diedrich,* 805 P.2d at 366 (holding that the superior court properly considered non-Section 1983 claims as an administrative appeal).

**32.** FNSBCO 8.16.010(B).

**33.** FNSBCO 8.16.010(A).

the time of the rezone from GU–1 to RR, [she] was not required to comply with the requirements of FNSBCO § 18.50.130." Balough notes that the requirements of FNSBCO 18.50.130 only apply to junkyards when they are conditional uses. She claims that, because her junkyard was a permitted use in the GU–1 zone and not a conditional use, her junkyard is "expressly exempted from the junkyard requirements of the Zoning segment of the FNSB Code—Title 18." Therefore, Balough concludes, "it is ludicrous to condition [her] grandfather rights on compliance with the junkyard requirements of FNSBCO § 8.16.030, which is contained in the Health and Safety segment of the FNSB Code."

Balough's argument is not well taken. FNSB has never attempted to enforce FNSBCO 18.50.130. Rather, all correspondence and hearings regarding Balough's junkyard refer to Balough's compliance, or lack of compliance, with FNSBCO 8.16.030. Balough is correct in her assertion that FNSBCO 8.16.030 is contained within the Health and Safety section of the FNSB Code of Ordinances. But that is no indication that Title 8's definitions of "junk" and "junkyard," and its fencing requirements, do not apply to junkyards that are permitted uses within a certain zoning district. Rather, that fact suggests that the definitions and fencing requirements apply to *all* junkyards, for health and safety reasons, regardless of the zone in which they are located.

Balough also argues that requiring a permitted use junkyard to comply with FNSBCO 8.16.030 renders superfluous the requirements of FNSBCO 18.50.130, which apply only to conditional use junkyards. While FNSBCO 18.50.130(C) repeats part of the fencing requirements listed in FNSBCO 8.16.030, the ordinance puts many additional requirements on junkyards operating under conditional use permits, including: (1) the

junkyard cannot be within 500 feet of certain buildings; (2) the junkyard must have "direct access from a major collector or arterial street"; (3) the type of screen the junkyard owner anticipates using to obscure the public view must be specified in the conditional use application; and (4) "[a] drainage plan specifying the method of disposing of surface runoff from the site shall be subject to the approval."[34] Clearly, the ordinance setting out specific standards for conditional use junkyards would not be rendered superfluous by requiring all junkyards to abide by the few requirements enumerated by the Health and Safety title's junkyard ordinance.

Balough's argument that she was not required to comply with FNSBCO 18.50.130, while correct, is irrelevant.

3. *Is the Board of Adjustment's decision to deny Balough grandfather rights supported by substantial evidence?*

Deciding whether there is substantial evidence to support the BOA's revocation of Balough's grandfather rights involves a two-step process. First, this court must decide what requirements Balough was required to meet for her junkyard to be considered a nonconforming use within the RR zoning district. Second, the court must decide whether she met those requirements.

a. *Must Balough's junkyard have been in compliance with FNSBCO 8.16.030 to be a nonconforming use?*

FNSBCO 18.56.020 provides, in part, that [a]ny nonconforming ... use ... which existed lawfully prior to the effective date of the ordinance codified in this title or any ... use ... which has become nonconforming upon the adoption of the ordinance codified in this title ... may be continued, subject to the restrictions in this chapter."[35]

---

34. FNSBCO 18.50.130(A)-(D).

35. A nonconforming use is one "which was *lawfully* established prior to the adoption, revision or amendment of this title, but which fails, by reason of such adoption, revision or amendment, to conform to the present requirements of the zoning district in which it is located." FNSBCO 18.06.010(A)(154) (emphasis added). "Permitted

Use" is defined as "any use ... which is or may be lawfully established in a particular zoning district, provided it conforms with all requirements and regulations of this title for [that] zoning district in which such use is or is proposed to be located." FNSBCO 18.06.010(A)(155). "Lawful" is defined as "not in violation of any

Balough argues that her junkyard was a lawful use within the GU–1 zone, and that therefore she met the requirements of FNSBCO 18.56.020 and was wrongfully denied nonconforming/grandfather status. Balough defines "lawful use" as "an authorized type" of use. She argues that whether the junkyard was a lawful use within the GU–1 zoning district is a completely separate question from whether or not the junkyard was in compliance with the regulations governing that use. If the "lawful use" junkyard was not in compliance with the regulations governing the operation of junkyards, Balough argues, FNSB cannot deny grandfather rights; rather, it may only require her to bring the junkyard into compliance.

FNSB argues that there is a difference between a "lawful use" and a "permitted use." While a junkyard is a "permitted use" within a GU–1 zoning district, FNSB argues, a junkyard is only a "lawful use" if it is in compliance with the junkyard ordinance (FNSBCO 8.16.030). Because Balough's junkyard was not in compliance with the junkyard ordinance, FNSB argues, it was not a lawful use, and therefore she was correctly denied grandfather rights.

The crux of the issue is this: Does the phrase "existed lawfully prior to the effective date," contained within FNSBCO 18.56.020, mean that the junkyard need only have been an authorized use in the GU–1 zoning district in order to be considered a nonconforming use within the RR zoning district, or does it mean that the junkyard must have been in complete compliance with all FNSB code ordinances as of January 15, 1993, the day the Borough Assembly rezoned the area from GU–1 to RR?

This presents a question to which we apply our independent judgment since the issue now addressed is a "pure question[ ] of statutory construction which do[es] not involve

local, state or federal law." FNSBCO 18.06.010(A)(78).

**36.** Marlow v. Municipality of Anchorage, 889 P.2d 599, 604 n. 1 (Alaska 1995).

**37.** Carroll v. Hurst, 103 Ill.App.3d 984, 59 Ill. Dec. 587, 431 N.E.2d 1344, 1347 (1982).

**38.** Town of Scituate v. O'Rourke, 103 R.I. 499, 239 A.2d 176, 180 (1968).

agency expertise." [36] We conclude that for a junkyard to be a nonconforming use under FNSBCO 18.56.020, it must have existed as a lawful use prior to the effective date, or adoption, of the ordinance which declared the use no longer lawful. Whether a use is a lawful use in the first instance, and whether it is a permitted use once its lawfulness is established, are separate questions. A junkyard is a lawful use under GU–1 zoning. It is a non-conforming use under RR zoning. Yet to be lawful, both permitted junkyards under GU–1 and nonconforming junkyards under RR must comply with FNSBCO 8.16.030, which provides that junkyards "shall [not] be established or *continued*" unless certain conditions are met. (Emphasis added.) The terms "permitted" and "lawful" are not one and the same; the FNSB Code does not use the terms interchangeably. Rather, the term "lawful" is used in both the definitions of nonconforming use and permitted use. "Lawful," therefore, could not merely mean "permitted," without rendering the definition section of the Code tautological, i.e., by defining a lawful use as a use which is lawful.

FNSB argues that interpreting FNSBCO 18.56.020 to require compliance with the entire code is consistent with the generally accepted rule that "the illegality of a prior use will result in a denial of protected status for the use under a nonconforming use exception." [37] There is a split among jurisdictions regarding how strictly courts should apply this general rule.

"The diversity of opinion arises as to just what renders a pre-existing use unlawful." [38] Some courts have concluded that "only a noncompliance with an ordinance which regulates the use of land will disqualify an individual's property from attaining the status of a legal nonconforming use." [39] Other courts,

**39.** Id.; see also, e.g., Carroll, 59 Ill.Dec. 587, 431 N.E.2d at 1347 (holding that the defendant's failure to obtain a license did not operate to deny nonconforming status because "the better rule is to make a distinction between violations of statutes designed to regulate land use [and] violations of statutes whose purpose is totally unrelated to land use planning"); Trailer City, Inc. v. Board of Adjustment, 218 N.W.2d 645, 648 (Iowa 1974) (holding that "failure to comply with local

however, strictly apply the general rule and hold that any contravention of an ordinance, whether or not the ordinance relates to the land, is sufficient to deny nonconforming status.[40]

█ In this case, the ordinance requiring junkyards to meet certain requirements regulates the use of that land. Thus, for Balough's junkyard to become a grandfathered nonconforming use, it must have been in compliance with FNSBCO 8.16.030 on January 15, 1993. However, that provision cannot be read in isolation. By its terms the ordinance contemplates the establishment or *continuation* of a junkyard. In other words, it contemplates that if a junkyard is not operating in compliance with its provisions, the junkyard will not be permitted to continue unless it is brought into compliance. Thus, while the ordinance relates in fact to the use of the land and is not merely a licensing ordinance, that does not end the inquiry. Balough's noncompliance with the junkyard ordinance does not automatically lead to the conclusion that her junkyard was unlawful and hence not entitled to protection under FNSBCO 18.56.020. If a property owner is using his or her property for a lawful use, but is not in compliance with regulations covering that use, due process requires that zoning boards assess the immediate prospect of compliance before denying nonconforming use status.

Next we consider whether Balough was operating her junkyard in compliance when FNSB changed the zoning. After that we look to whether due process required that she get a chance to bring the junkyard into compliance before losing nonconforming use status.

b. *Did the Board of Adjustment have substantial evidence to conclude that the junkyard did not comply with FNSBCO 8.16.030 on January 15, 1993?*

The BOA reached the following conclusions:

1. The Board concludes that for a use to be a lawful use on the date of a rezone, the use must comply with "all of the applicable use regulations in the zoning district" where the property is located. FNSB 18.06.010.B.150. The Board interprets "all of the applicable use regulations" to mean that the owners were required to comply with the junkyard regulations under FNSB 8.16 in order to qualify as a conforming use under Title 18 of the Borough Code.

2. The junkyard did not comply with FNSB 8.16.030, an applicable use regulation in the General Use zone, on January 15, 1993, the effective date of the rezone. On January 15, 1993, the junkyard was not a conforming use under FNSB 18.06.010.-B.150. A use which was not a conforming use on the date of a rezone does not have grandfather rights. FNSB 18.56.020.

3. The junkyard did not exist lawfully prior to January 15, 1993, the effective date of the rezone.

Junkyards are not lawful uses in RR zoning districts. As discussed above, for a junkyard to be a nonconforming use in a RR zoning district means that the junkyard may continue operating even though there has been a zoning change and junkyards are no longer lawful. But it may only do so if it lawfully existed in the GU–1 district. The BOA concluded that for a junkyard to have lawfully existed in the GU–1 district, it must have been in compliance with FNSBCO 8.16.030. The BOA thus had to determine whether Balough's fence was in compliance with those junkyard regulations in order to determine whether she was properly granted nonconforming use (grandfather) status. It concluded that she had not been in compliance and therefore denied her nonconforming use status.

FNSBCO 8.16.030 states that

No junkyard or auto wrecking yard shall be established or continued unless such

---

or state licensing provision ordinarily will not destroy a nonconforming use").

**40.** *See, e.g., Chamberlin v. Hoadley,* 134 Vt. 359, 360 A.2d 100, 102 (1976) (holding that a junk-

yard that did not comply with licensing or certificate requirements was *not in compliance with the law*).

junkyard or auto wrecking yard is completely obscured from view of any traveled or occupied location within five hundred feet from any boundary of the junkyard or auto wrecking yard, within a building or within a continuous solid fence no less than eight feet in height. The fence may be of evergreen planting or other natural planting or topography of sufficient density to provide a year-round screen.

The BOA's conclusion that Balough's junkyard did not comply with the requirements of FNSBCO 8.16.030 was based on the following facts: (1) "[t]he wooden fence [had] not been completed on the west and south sides of the junkyard"; (2) the fence was not continuous; (3) the fence did not completely obscure the junkyard from view; (4) the vegetation on the west side of the fence did not obscure the junkyard from view; and (5) the fence was less than eight feet in height in some places.

■ We conclude that the BOA had substantial evidence to find that Balough's junkyard did not comply with the junkyard ordinance. We interpret the ordinance to mean that Balough's junkyard would be in compliance if it met any one of three requirements:[41] (1) the junkyard is completely obscured from view; (2) the junkyard is contained within a building; or (3) the junkyard is contained within a continuous solid fence no less than eight feet in height.[42] The BOA had substantial evidence to conclude that Balough's junkyard met none of these three requirements. First, neighbors testified that the junkyard was not completely obscured from view. Second, the junkyard is not contained within a building. Third, the BOA heard testimony that the fence surrounding the junkyard was not continuous,

and also testimony that the fence was not eight feet in height in all places. Although Balough testified that the fence was eight feet high in all places on January 15, 1993, and Nutter testified that he felt that the junkyard was completely obscured from view, reasonable minds could still conclude that the testimony of the neighbors, the photographs, and the video tape were more persuasive. Specifically, the BOA could reasonably have concluded that Balough's testimony was less credible than the neighbors, and that, because Nutter did not walk the perimeter of the junkyard and closely examine the fence, his testimony should be given less weight. Looking at the agency record as a whole, and giving the BOA the necessary deference, we conclude that the BOA had substantial evidence to conclude that Balough's junkyard did not conform with any of the three requirements set out in FNSBCO 8.16.030, and, therefore, should not be granted nonconforming use status as it then stood.

E. *Balough's State and Federal Constitutional Claims*

1. *Procedural due process claims pertaining to the Borough Assembly's passage of rezoning and the Board of Adjustment's denial of nonconforming use status.*

Although Balough raises numerous claims under the federal and state constitutions, we first address her claim that FNSB's denial of nonconforming use status for her junkyard deprived her of property without due process of law in contravention of article I, section 7 of the Alaska Constitution.[43]

Black's Law Dictionary defines the phrase "vested rights" as

41. To the extent that the superior court concluded otherwise, we do not agree. The superior court stated that "the ordinance does not place the word 'or' between the requirement that junk be obscured from view and the requirement that a fence be a minimum of eight feet in height. The ordinance requires both." The fact that the ordinance permits vegetative screening implies that an eight-foot fence is not required if the junkyard is completely obscured from view. It would be inconsistent to permit a vegetative screen and yet also require an eight-foot fence.

Based on the superior court's interpretation, however, a junkyard would have to have *both* an eight-foot fence and a vegetative screen to be in compliance.

42. *See* FNSBCO 8.16.030.

43. Article I, section 7 of the Alaska Constitution provides, in part, that "[n]o person shall be deprived of life, liberty, or property, without due process of law."

rights which have so completely and definitely accrued to or settled in a person that they are not subject to be defeated or canceled by the act of any other private person, and which it is right and equitable that the government should recognize and protect, as being lawful in themselves, and settled according to the then current rules of law, and of which the individual could not be deprived arbitrarily without injustice, or of which he could not justly be deprived otherwise than by the established methods of procedure and for the public welfare.[44]

This court has previously held that "[v]ested property rights are protected against state action by the provision of the Fourteenth Amendment of the Constitution of the United States and by Section 7 of Article I of our state constitution."[45] This court has further stated that the term "vested right" is "conclusory—a right is vested when it has been so far perfected that it cannot be taken away by statute."[46] We have also held that a person can have a vested property right despite a zoning change if that person has a nonconforming use. In *Earth Movers of Fairbanks, Inc. v. Fairbanks North Star Borough*,[47] we stated that

> A nonconforming use has been defined as a use which lawfully existed prior to the enactment of a zoning ordinance, and which is maintained after the effective date of the ordinance, although it does not comply with the zoning restrictions applicable to the area in which it is situated. Such a use has also been described as a vested property right that zoning ordinances generally may not abrogate.

Balough argues that she had a "vested right" in the zoning classification as it existed at the time she started her junkyard, and claims to a have a "vested right" in operating a junkyard on her property, because she purchased the property in reliance on the GU-1 zoning and invested significant time, effort and expenditures into the junkyard. She cites to *Nemmers v. City of Dubuque*[48] and *Nasierowski Brothers Investment Co. v. City of Sterling Heights*[49] in support of her argument that, because she invested significant time, effort and expenditures, she had a vested right in operating her junkyard. Both of these cases are easily distinguishable from the instant case.[50] In quoting *Underwood v. State*, Balough argues that "the Court recognized ... that individuals do have vested rights in 'real property situations in which the complaining party indisputably possess[es] property rights in specific land.'"[51] Balough cites New York authority for the proposition that "the existence of an actual yet curable violation—such as the fencing violations alleged by FNSB in this case—do not suffice to prevent a vested right from accruing when the use at issue actually occurred prior to the rezone." Finally, Balough cites *Kohl v. Legoullon*[52] to support her assertion that "a land-use remedy must be consistent with the violation and must not impose any greater restriction than is necessary to protect persons from the violation." FNSB, however, argues that Balough did not have a vested right because she never lawfully established a nonconforming use prior to January 15, 1993.

Although *Kohl* is distinguishable from the instant case because it involved restrictive covenants and not zoning ordinances, *Kohl* nonetheless contains language which is relevant to our inquiry. We observed that an "injunction should always be so worded as not to impose on the defendant any greater restriction than is necessary to protect the plaintiff from the injury of which he com-

---

**44.** Black's Law Dictionary 1564 (6th ed.1990).

**45.** *Bidwell v. Scheele*, 355 P.2d 584, 586 (Alaska 1960).

**46.** *Norton v. Alcoholic Bev. Control Bd.*, 695 P.2d 1090, 1092–93 (Alaska 1985) (internal quotations omitted).

**47.** 865 P.2d 741, 742 n. 1 (Alaska 1993).

**48.** 716 F.2d 1194 (8th Cir.1983).

**49.** 949 F.2d 890 (6th Cir.1991).

**50.** *Id.* at 897; *Nemmers*, 716 F.2d at 1198.

**51.** 881 P.2d 322, 327 (Alaska 1994).

**52.** 936 P.2d 514, 519 (Alaska 1997).

plains."[53] We addressed what part of a house would have to be removed in order to comply with a setback covenant, stating that "[t]he Legoullons validly complain of a horizontal violation. The superior court erred by ordering a vertical remedy."[54] Not all of the structure subject to removal under the challenged order offended the setback covenant. To fully comply with the setback restriction, the Kohls needed only to remove that portion of their house above the third floor and within twenty-five feet of the property line. Here, as in *Kohl*, bringing the junkyard into compliance now would remove the barrier to its being a *lawful* permitted use in the GU–1 zone, which is what Balough was attempting to do when the use became nonconforming through the rezoning process.

▮▮▮▮ Balough has a vested property right in her junkyard, since it was a lawful use within the GU–1 zoning district, and only became a nonconforming use within the RR district.[55] It was at the time of rezoning that Balough's vested right in operating her junkyard could not be denied her without due process of law.[56]

Balough argues that this court should not apply a "formalistic approach" to evaluating whether she has a vested right in operating a junkyard on her property. She asserts that "where the use at issue is in fact in existence on the date of a rezone, but there is a lack of strict compliance with regulations governing one engaging in such use, a vested right will nevertheless be found where the noncompliance is capable of being remedied." She supports this argument by citing *Platt v. Murdock*[57] and *Drysdale v. Beachnau*.[58] Because of its facts *Platt* is not helpful. *Drysdale*, however, presents facts similar to the instant case. A dump was operating in violation of a county health regulation, which was passed in 1948. The dump was still in violation when the rezoning was passed in 1954.[59] Using language that supports Balough's argument, the court concluded that it did not believe that "a violation of a provision of a regulatory ordinance necessarily destroys the lawfulness of the basic use where compliance with the regulation can be had on demand and where such compliance actually follows."[60] The decision in *Drysdale* rests on the factual findings of the superior court, which included: (1) that the defendant received no notice of noncompliance prior to 1957 (three years after the rezoning), even though the health regulations were passed in 1948; (2) that "one of the problems of the health department is the disposal of garbage; (3) that the landfill is the best method outside cities; and (4) that the landfill of defendants is the best operated one of the [three] in Ingham county."[61] Although Balough's case is distinguishable on its facts because she had notice of noncompliance prior to the rezoning, Balough's argument is persuasive.

**53.** *Id.* (quoting Henry L. McClintock, *Principles of Equity* 392 (1948)).

**54.** *Id.* at 519.

**55.** Balough could not have a vested right in the Department of Community Planning's decision to grant her grandfather rights. FNSBCO 18.52.030 provides that Department of Community Planning decisions can be appealed to a Board of Adjustment. With an appeal process built into the Department of Community Planning's decision to grant Balough grandfather rights, Balough cannot argue that she had a vested right in the Department's initial decision to grant her nonconforming status and that a decision by the BOA reversing the Department's decision would be unconstitutional.

**56.** The superior court stated that Balough "seem[s] to be arguing that under substantive due process [she] had a right to retain the GU–1 zoning because the change to RR zoning was arbitrary or irrational." The court noted that

Balough has "a right to be free of an arbitrary or irrational zoning action affecting their property." In her appeal, however, Balough does not assert that the Assembly's decision to rezone was arbitrary and therefore denied her due process. While Balough argues that her substantive due process rights were violated by the Assembly's decision to rezone because it constituted spot zoning (i.e, arbitrary, unreasonable granting of a zoning classification), she makes a separate "vested rights" argument on appeal. *See infra* Part III.E.2.a for discussion of "spot zoning."

**57.** 24 Misc.2d 552, 193 N.Y.S.2d 869 (Sup.Ct. 1959).

**58.** 359 Mich. 152, 101 N.W.2d 346 (1960).

**59.** *Id.* at 348.

**60.** *Id.*

**61.** *Id.*

Balough's junkyard was not operating in compliance with the FNSB code of ordinances, a circumstance Balough was attempting to rectify when the rezoning was adopted. It was not until after the rezoning and the zoning administrator's decision to grant Balough grandfather rights that some residents appealed and the Board found the administrator's decision wanting. It was only then that Balough learned that her attempt at compliance fell short of what was required. Nonetheless, Balough was given no opportunity to proceed with her attempted compliance. No evidence was offered that she would not or could not comply with the ordinance, after the BOA overruled the decision of the zoning administrator. Having been given no opportunity to remedy the deficiencies in her attempted compliance, Balough did not receive all the process to which she was due.

2. *Substantive due process claims pertaining to the Borough Assembly's passage of the rezoning.*

Balough claims that the Borough Assembly violated her right to substantive due process "concern[ing] the validity of an enactment of a legislative body, rather than a decision of a zoning board." [62] We, therefore, should independently consider the legal conclusions which led the superior court to reject Balough's claims that the ordinance is invalid

and uphold the superior court's findings of fact unless they are "clearly erroneous." [63]

 Article I, section 7 of the Alaska Constitution states that "[n]o person shall be deprived of life, liberty, or property, without due process of law." [64] We have stated that

[s]ubstantive due process is denied when a legislative enactment has no reasonable relationship to a legitimate governmental purpose. . . . The constitutional guarantee of substantive due process assures only that a legislative body's decision is not arbitrary but instead based upon some rational policy.[65]

The burden of demonstrating that there is no rational basis for the challenged legislation is on the party claiming to have been denied substantive due process.[66] Furthermore, this burden is a heavy one, "for if any conceivable legitimate public policy for the enactment is apparent on its face or is offered by those defending the enactment, the opponents of the measure must disprove the factual basis for such a justification." [67] When we inquire into arbitrariness, we must begin "with the presumption that the action of the legislature is proper." [68]

a. *Did the Borough Assembly engage in unconstitutional "spot zoning" when it rezoned the seventy-five acres in Nugget Loop?* [69]

Balough argues that the Borough Assembly's decision to rezone the seventy-five acres

---

**62.** *Griswold v. City of Homer*, 925 P.2d 1015, 1019 n. 3 (Alaska 1996) (citing *Concerned Citizens of S. Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974), which analyzed a Borough Assembly's ordinance as a legislative enactment).

**63.** *Id.*

**64.** "Alaska's . . . due process clauses confer broader protection than do their federal counterparts." *Burnor v. State*, 829 P.2d 837, 839 (Alaska App.1992).

**65.** *Concerned Citizens*, 527 P.2d at 452; *see also Mobil Oil Corp. v. Local Boundary Comm'n*, 518 P.2d 92, 101 (Alaska 1974) ("[T]he test of substantive due process is whether the action of the legislature must be said to be arbitrary. Judicial concern for whether a statute comports with substantive due process goes no farther than a perception that the act furthers a legitimate governmental interest.") (footnotes omitted); *Allam*

*v. State*, 830 P.2d 435, 438 (Alaska App.1992) ("To satisfy the requirement of substantive due process, legislation must be rationally related to a valid legislative purpose.").

**66.** *Concerned Citizens*, 527 P.2d at 452.

**67.** *Id.*

**68.** *Id.*

**69.** Balough brought her constitutional "spot zoning" claim as a part of her administrative appeal, and brought it again in her direct civil suit against FNSB. The superior court, in resolving Balough's administrative appeal, addressed Balough's claims that the Borough Assembly's decision to rezone the property was an unconstitutional "spot zoning." The court applied an abuse of discretion standard to the Assembly's rezoning decision. FNSB never argued that Balough was time barred from challenging the Bor-

at issue from GU–1 to RR was constitutionally impermissible spot zoning. Specifically, Balough argues that "the rezone itself was motivated by a discriminatory animus and was but a blatant attempt to deprive [her] of the existing use of [her] property in order to benefit the persons initiating the rezone." Balough's claim of spot zoning essentially alleges that the Borough Assembly violated her rights to substantive due process because it acted arbitrarily and did not have a reasonable basis for the rezoning. FNSB, however, argues that the Borough Assembly's decision to rezone does not fit the definition of "spot zoning."

We have stated that "the 'classic' definition of spot zoning is 'the process of singling out a small parcel of land for a use classification totally different from that of the surrounding area, for the benefit of the owner of such property and to the detriment of other owners.' " [70] In *Griswold v. City of Homer*, this court stated that it would consider the following three factors in determining whether a zoning ordinance constituted unconstitutional spot zoning: "(1) the consistency of the amendment with the comprehensive plan; (2) the benefits and detriments of the amendment to the owners, adjacent landowners, and community; and (3) the size of the area 'rezoned.' " [71]

■■■■ We conclude that Balough did not allege facts that amount to a prima facie case of spot zoning. Balough's brief does not address any of the factors that this court stated were necessary in determining

whether an ordinance constitutes unconstitutional spot zoning. Rather, Balough's brief makes only conclusory statements regarding the Borough Assembly's decision to rezone the seventy-five acres. As the extensive discussion of spot zoning in *Griswold* demonstrates, whether an ordinance is unconstitutional spot zoning is case-specific.[72] Balough's brief is devoid of any evidence to support her claim that the Borough Assembly acted in an unconstitutionally arbitrary way. Specifically, Balough never addressed whether the Borough Assembly's decision to rezone was consistent with FNSB's comprehensive plan, whether the rezoning unfairly benefitted a private owner, or whether the size of the area rezoned did, or did not, suggest spot zoning.[73] Additionally, pursuant to the spot zoning analysis set out in *Griswold*, Balough's one-sentence assertion that the Borough Assembly acted with "discriminatory animus" is irrelevant to a substantive due process claim that the Assembly engaged in spot zoning.[74]

b. *Did the Borough Assembly violate Balough's right to substantive due process when it refused to exempt her property from the rezoning?*

Balough notes that it is FNSB's frequent practice to exclude property on the periphery of the rezoning upon the owner's request. Therefore, Balough concludes, "the Borough's arbitrary failure to exclude [her] property from the rezone effects a denial of due process." Balough cites *State v. En-*

---

ough Assembly's rezoning decision in her administrative appeal. Arguably, Balough needed to challenge the rezoning decision by February 15, 1993, thirty days after the rezoning was final. Balough waited and challenged the Borough Assembly's rezoning as a part of her suit filed in October. FNSB failed to object and the superior court addressed the rezoning decision as if it were a part of the administrative appeal.

**70.** *Griswold v. City of Homer*, 925 P.2d 1015, 1020 (Alaska 1996) (quoting Robert M. Anderson, *American Law of Zoning* § 5.12, at 359 (1986)).

**71.** *Id.*

**72.** *See id.* ("Spot zoning analysis depends primarily on the facts and circumstances of the particular case.").

**73.** Although the superior court's decision rejecting Balough's claim of spot zoning preceded this court's decision in *Griswold*, the court addressed factors similar those enumerated in *Griswold*. Those factors included: size of the parcel rezoned; whether Balough's property was treated differently from similar property; and whether the rezoning was consistent with FNSB's comprehensive plan.

**74.** Balough's claim that the "FNSB is arbitrarily and selectively enforcing its fencing requirements against Balough but not against other persons" is waived for inadequate briefing. *See Petersen v. Mutual Life Ins. Co. of N.Y.*, 803 P.2d 406, 410 (Alaska 1990) ("Where a point is not given more than a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

*serch Alaska Construction, Inc.*[75] in support of her contention.

Balough's argument is not persuasive. First, as she acknowledges, there is no provision of the FNSB Code concerning rezoning exemptions. Second, this court's decision in *Enserch* addresses the necessary requirements for stating a claim under the Equal Protection Clause of the Alaska Constitution; it does not address due process.[76] Third, Balough's argument that the Borough Assembly acted arbitrarily in refusing to exclude her property from the rezoning, and thus denied her due process, is seemingly based on Nutter's affirmative response to the question: "[Is Balough's property located in an area] where the decision-making body would tend to exempt the property from a rezone?" Specifically, Nutter responded, "[i]f any property were to be excluded, [Balough's property] would be the condition that they would—they would consider it."

Balough fails to acknowledge that Nutter testified before the Borough Assembly in opposition to exempting Balough's property from the rezoning. Nutter stated that he "believe[d] at least from the zoning department's position, [that] protection of our neighborhood should be [the Assembly's] top priority. And [he was] not inclined to want to see [Balough's] property excluded from the rezone." Nutter based his opinion on the notion that the seventy-five acres of land at issue was in a residential area and while "certain types of commercial uses are not inappropriate," they detract from property values.

 In sum, no FNSB ordinance or state statute requires a zoning commission to exempt property from a rezoning upon a property owner's request. Nor did Balough offer any evidence that the Borough Assembly's actions were unreasonably arbitrary. Balough, therefore, failed to meet her burden of proving that the Borough Assembly's refusal to exempt her property had "no reasonable relationship to a legitimate governmental purpose."[77]

3. *Did the Borough Assembly's rezoning decision, and the Board of Adjustment's subsequent denial of grandfather rights, constitute an unconstitutional taking of Balough's property?*

 Article I, section 18 of the Alaska Constitution provides: "Private property shall not be taken or damaged for public use without just compensation."[78] In recognizing United States Supreme Court precedent, this court has noted that there are two classes of per se takings: "(1) cases of physical invasion and (2) cases where a regulation denies a landowner of all economically feasible use of the property."[79] When a "case does not fall into either of these categories, courts must engage in a case-specific inquiry to determine whether governmental action effects a taking."[80] Factors that a court should consider in making this determination include: "(1) the character of the governmental action; (2) its economic impact; and (3) its interference with reasonable investment-backed expectations."[81] In addition, we have stated that "[t]he legitimacy of the interest advanced by the regulation or land-use decision is also relevant to this inquiry."[82]

 Balough argues that

FNSB's actions have substantially impaired the marketability of [her] property and have otherwise abridged the economic advantages of ownership and the opportunities and rewards [her] ingenious abilities and resources would have produced if the property were to be utilized as [she] rea-

75. 787 P.2d 624 (Alaska 1989).

76. *See id.* at 631.

77. *Concerned Citizens of S. Kenai Peninsula v. Kenai Peninsula Borough,* 527 P.2d 447, 452 (Alaska 1974).

78. "The inclusion of the term 'damage' in the Alaska Constitution affords the property owner broader protection than that conferred by the Fifth Amendment of the Federal Constitution." *Anchorage v. Sandberg,* 861 P.2d 554, 557 (Alaska 1993).

79. *Id.*

80. *Id.*

81. *Id.*

82. *Id.*

sonably expected and intended when she purchased the property and made subsequent expenditures toward that end.

While the BOA's decision to deny Balough grandfather rights would terminate her right to use her property as a junkyard, the decision did leave her with economically feasible use of her property. Presumably, Balough could sell her property to someone who wishes to build a house on it, or use it in any other manner permitted in the RR zoning district.[83] Balough herself does not seem to be claiming that she has no economically feasible use for her land; rather, she argues that the BOA's decision "substantially impaired the marketability" of her property, though she presented no evidence to support her assertion.

■ Even though the BOA's actions did not constitute a per se taking, Balough could still be entitled to compensation if the BOA's action amounted to a taking based on the three-part analysis articulated above. Balough does not address the three factors used to determine whether a government action constitutes a taking even if there is no per se taking.

First, Balough's brief is unclear as to exactly what government action she feels amounted to a taking. Based on the case law she cites, Balough appears to be arguing that the Borough Assembly's decision to rezone, thus eliminating junkyards as a permitted use, constituted a taking. The Assembly's rezoning action was a legitimate government action, consistent with FNSB's comprehensive zoning plan. The Assembly rezoned Nugget Loop to RR in response to neighbors' concerns about safety and aesthetics. Second, any negative economic impact of the rezoning seems solely concentrated in Balough's fence-building efforts. Whether her property was located in a RR zoning district or a GU–1 zoning district, however, Balough

would be required to obscure the junkyard from view. The Assembly's rezoning decision, therefore, did not create the costs she incurred when building her fence. Lastly, Balough only asserted that she purchased the property in order to operate a junkyard after she had filed suit against FNSB.[84] Prior to her deposition, however, Balough had never alleged to have bought the property for the purpose of storing junked cars. In fact, her husband told the Borough Assembly that the junkyard "was only temporary; that [he] did not intend to turn it into a junkyard."

Because the Assembly's action did not amount to a per se taking of Balough's property, and because application of the three factors articulated in *Sandberg* does not reveal a taking, we conclude that Balough was not a victim of an unconstitutional taking.

4. *Was it a violation of Balough's right to due process of law that the Borough Assembly sat as the Board of Adjustment?*

■ Due process requirements apply in administrative proceedings.

[A] fair trial in a fair tribunal is a basic requirement of due process. This applies to administrative agencies which adjudicate as well as to courts. Not only is a biased decision maker constitutionally unacceptable[,] but our system of law has always endeavored to prevent even the probability of unfairness.[85]

In *Keiner v. City of Anchorage*, we stated that the Anchorage board of adjustment did not deny Keiner due process because

The board made its findings only after due notice and full opportunity to be heard; the conduct of the hearing was consistent with the essentials of a fair trial; there is no assertion that the board was anything

---

**83.** *See Cannone v. Noey,* 867 P.2d 797, 801 (Alaska 1994) (stating that there was no per se taking because the parcel could have been sold or it could have been used for a different use).

**84.** In her deposition, Balough was asked whether she was "thinking of storing vehicles" on the property at the time she purchased it. Balough responded: "Yes. And prior to . . . closing . . . we asked [the seller] if we could bring cars out to

the property and—before closing and she said, sure, no problem."

**85.** *State v. Lundgren Pac. Const. Co., Inc.,* 603 P.2d 889, 895 (Alaska 1979) (quoting *Withrow v. Larkin,* 421 U.S. 35, 46–47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)) (internal citations and quotations omitted).

but impartial; and a complete record of the proceedings was kept so that the reviewing court was able to determine that there was no substantial failure to observe applicable rules of law and procedure, and that in all other respects Keiner was afforded a fair hearing.[86]

The most plausible argument that Balough was denied due process is that the BOA members were not impartial. Balough had due notice and a full and fair opportunity to be heard, and those who testified before the BOA were sworn in. If, however, the BOA was not a neutral body, Balough's right to due process was violated. A reading of the Assembly transcripts reveals potential biases of Assembly members, who later sat on the BOA. Balough, however, does not make this argument. Balough's only argument that the BOA was not impartial pertains exclusively to Assembly Member Therrien's alleged conflict of interest, which we discuss in the following subsection. Instead, Balough argues that her due process rights were violated because the Borough Assembly wore three hats when it: (1) passed the grandfather rights ordinance; (2) rezoned the seventy-five-acre parcel of land; and (3) sat as the BOA and rendered the decision revoking Balough's grandfather rights. She states that "the broad, unrestrained—essentially political—discretion granted to the Assembly/Board of Adjustment is such so as to itself constitute a violation of due process." Balough also argues that the Assembly should not be involved in rezoning decisions because such decisions are quasi-judicial, and the Assembly is not trained in the law.[87]

Balough's argument that the BOA violated her rights to due process, absent an allegation of partiality, is unconvincing.

■ First, the Borough Assembly sat as a legislative body when it enacted both the grandfather rights ordinance and the ordinance that resulted in the rezoning of the seventy-five-acre parcel.[88] In *Griswold* we stated that "[w]e have repeatedly held that it is the role of elected representatives rather than the courts to decide whether a particular statute or ordinance is a wise one." [89] The Borough Assembly, therefore, was acting in its proper legislative capacity when it enacted FNSBCO 18.56.020, and when it rezoned the seventy-five-acre parcel within the FNSB as RR.[90]

■ Second, the Borough Assembly properly sat as the BOA when it revoked Balough's grandfather rights.[91] The BOA gave Balough notice of the hearing and the right to be heard; both she and her attorney spoke at the hearing; and the BOA voted to and did consider a letter and photographs written by her attorney to the BOA. Additionally, while the BOA and the Borough Assembly share the same members, the BOA was not reviewing a decision by the Borough Assembly; rather, the BOA was hearing an appeal from a decision of the Department of Community Planning. The BOA had no input into the Department's decision to grant Balough grandfather rights, and, therefore, no appearance of impropriety existed when the BOA reviewed the Department's decision. The mere fact that the BOA comprised the same members as the Borough Assembly does not amount to a denial of due process.

5. *Did Assembly Member Therrien's participation in the rezoning and Board of Adjustment hearing amount to a denial of Balough's due process rights?*

■ Balough argues that Assembly Member Therrien had an actual conflict of

---

86. 378 P.2d 406, 409–10 (Alaska 1963).

87. Balough is seemingly challenging the constitutionality of city councils sitting as boards of adjustment in general.

88. *See Griswold v. City of Homer,* 925 P.2d 1015, 1019 n. 3 (Alaska 1996) (stating that the Homer City Council's adoption of a zoning ordinance was an act of a "legislative body, rather than a decision of a zoning board").

89. *Id.* at 1019.

90. *See* FNSBCO 18.52.040 ("The borough assembly shall: A. Make determinations on requests for rezoning and amendments to this title.").

91. *See* FNSBCO 18.52.030 ("The borough assembly shall be the board of adjustment ... [and] shall hear and decide appeals of ... determinations made by the department of community planning in the enforcement of this title.").

interest; thus her participation in the rezoning decision and in the subsequent decision to deny Balough grandfather rights amounted to a denial of Balough's right to due process. Balough cites *Griswold* in support of her assertion. Furthermore, Balough argues that "fundamental fairness and professional ethics" required Therrien to refrain from participating in the decision making process.

During the January 14, 1993, Assembly meeting, Therrien told the Chair, "I think I might have to declare a conflict of interest because I represent several of the parties in this area and I feel that I should abstain. Not necessarily with regard to this, but I represent at least three of the people and I think it would be more appropriate [to abstain]." The Chair asked Therrien whether she had ever represented them on issues or matters relating to the rezoning. Upon Therrien's negative reply, the Chair stated that he "[did not] find that [Therrien had] a conflict of interest." Neither Balough or her attorney objected to Therrien's participation in the Assembly's rezoning vote, nor did they object to her participating as a member of the BOA in the decision to deny Balough grandfather rights. Balough's failure to object to Therrien's participation in the Assembly meeting or the BOA hearing effectively waives her right to raise such an objection on appeal.

### F. *Balough's Estoppel Claims*

Balough argues that the superior court erred when it refused to consider her estoppel claim as a part of her administrative appeal and that the court "compounded its error by dismissing [her] estoppel claim from the direct-civil-action aspect of the case." Balough further asserts that the superior court created a situation where, upon "bifurcating the case[,] certain components of the Complaint [were] made to vanish into thin air."

Balough's estoppel claim is based on her assertion that she detrimentally relied on FNSB's representations:

Balough clearly expended substantial sums and time in operating the property for several years as a junkyard, an authorized use under the prior zoning. Moreover, during 1993, Balough made yet further expenditures at the request and in reliance on FNSB's representations that the fencing should be made more substantial. When the unprecedented early and heavy snowfall occurred late that summer and prevented completion of the fencing until the following spring, Balough was informed by the FNSB's representative, Fred Rohn, that it would be acceptable for her to construct temporary fencing to comply with the ordinance and then complete the fencing in the Spring of 1992, thus remaining in compliance with the code all the while. Balough, in good faith, relied on FNSB's representations.

The best that can be said for Balough's estoppel claim is that she was told she could erect temporary fencing until spring, when she could complete permanent fencing. This seasonal reprieve was cut short by the successful rezoning effort, thereby depriving Balough of the opportunity to cure she had been promised. Since this argument is the essence of Balough's due process claim which we have determined in Balough's favor, Balough's estoppel claims are subsumed within the due process claim. We need not separately address the estoppel claims, since any error in failing to consider them is harmless.

### G. *Issues Relating to Balough's Direct Civil Action*

In the administrative appeal, the superior court concluded, based on the agency record, that (1) the Assembly's rezoning decision was not unconstitutional spot zoning; (2) the Assembly did not deny Balough due process of law; (3) the Assembly did not deny Balough equal protection of law; and (4) FNSB did not unconstitutionally take Balough's property. The superior court then used its conclusions in the administrative appeal to collaterally estop Balough's Section 1983 claims. The court concluded that (1) its decision in the administrative appeal was a final decision; (2) Balough had a full and fair opportunity to litigate the constitutional issues; and (3) all of Balough's Section 1983 claims were actually litigated and decided in the administrative appeal, with the possible exception of

Balough's vested rights argument. The court discussed this last issue more fully than it had in its discussion of the administrative appeal. Balough argues that the court erred in precluding her Section 1983 claims based on the court's decision in the administrative appeal.

In *Diedrich v. City of Ketchikan,*[92] this court discussed *Eilrich v. Remas,*[93] in which the court concluded that Eilrich's Section 1983 claims were barred by a prior unreviewed administrative proceeding. Applying *Eilrich,* we concluded that Diedrich was precluded from bringing his Section 1983 claims in a separate suit after his administrative appeal was dismissed, because he "was afforded ample opportunity to litigate his termination before the Board."[94] "Inherent in our conclusion[,]" we stated, "is our rejection of Diedrich's arguments that the Board was not a neutral body, and that the Board lacked the expertise to decide breach of contract and civil rights claims."[95]

■ This case presents even stronger reasons for precluding Balough from bringing her Section 1983 claims in a separate suit. In *Diedrich* and *Eilrich* the courts gave preclusive effect to unreviewed agency decisions, concluding that a litigant had a fair and full opportunity to be heard before the administrative boards. Here, Balough had judicial review of her constitutional claims by the superior court. Balough's brief incorrectly argues that the superior court gave preclusive effect to the BOA's decision. Balough is focusing on the wrong decision. The court gave preclusive effect *not* to the BOA's decision, but to its own decision in the administrative appeal. The superior court concluded that "the constitutional issues raised by Balough in the [administrative] appeal were adequately litigated through written briefs, including references to the record of adminis-

trative proceedings, and in oral argument" and that "[t]he determination of the constitutional issues on appeal satisfied due process."

■ In deciding whether the superior court's decision in the administrative appeal can have preclusive effect on the same issues brought in Balough's Section 1983 suit, we must decide whether the issues were "actually litigated and determined in the first action by a valid and final judgment, and [whether] the determination [was] essential to the judgment."[96] First, the superior court's decision in the administrative appeal was a final decision. Second, Balough had a full and fair opportunity to litigate the issues. Whether she aired her constitutional grievances before the superior court as part of her administrative appeal or as a part of her direct civil suit is irrelevant; she was given an opportunity to fully litigate all her constitutional claims.[97] Additionally, an administrative appeal limited to the agency record meets the requirements of procedural due process, and an additional opportunity to litigate constitutional claims heard without a trial de novo is not required.[98]

## H. *Attorney's Fees and Costs*

FNSB was granted two awards of attorney's fees and costs, the first as the prevailing party in Balough's administrative appeal and the second as the prevailing party in Balough's direct civil suit.

### 1. *Award of attorney's fees and costs in the administrative appeal*

Alaska Civil Rule 82 governs the award of attorney's fees in most civil cases. Alaska Appellate Rule 508, however, governs the award of costs and attorney's fees in an

---

92. 805 P.2d 362, 369 (Alaska 1991).

93. 839 F.2d 630 (9th Cir.1988).

94. *Diedrich,* 805 P.2d at 369–70.

95. *Id.* at 370.

96. *Bignell v. Wise Mechanical Contractors,* 720 P.2d 490, 494 (Alaska 1986).

97. In fact, the superior court addressed Balough's due process claim for a third time in deciding her motion for reconsideration.

98. *See Diedrich,* 805 P.2d at 370 n. 16 (citing *Gahr v. Trammel,* 796 F.2d 1063, 1069 (8th Cir. 1986) (giving preclusive effect in a Section 1983 case to a state court judgment even though the state court had not reviewed fact-finding of administrative board de novo)).

administrative appeal.[99] Attorney's fees in Section 1983 cases are governed by federal law.[100]

Since our resolution of Balough's due process claim in the administrative appeal requires us to remand the administrative proceeding to the BOA for further proceedings, the superior court's orders awarding FNSB attorney's fees and costs in the administrative appeal must be vacated.

### 2. Award of attorney's fees and costs in the direct civil suit

Balough argues that this award should be vacated for four reasons: (1) FNSB "failed to include any notice of a cost bill hearing as required by Civil Rule 79(a) when it submitted its cost bill"; (2) "costs in this aspect of the case are governed by 42 U.S.C. § 1988. Thus, since Balough's claims were not frivolous or unreasonable, FNSB is not entitled to an award of costs"; (3) "FNSB did not request attorney's fees under Section 1988 but has relied solely on Civil Rule 82 to support its request"; and (4) even if the Civil Rules did apply, "only a small portion of the costs taxed by the Clerk would be recoverable."

FNSB argues that while attorney's fees for Balough's Section 1983 claims are governed by Section 1988, Balough asserted state-law claims in her direct civil suit. Thus, FNSB was entitled to partial attorney's fees pursuant to Civil Rule 82. Furthermore, FNSB argues, it submitted an itemization to the lower court and the court awarded it fifty percent of attorney's fees, because the court concluded that fifty percent of FNSB's time had been spent on non-Section 1983 issues.

Balough is correct in her argument that any attorney's fees for federal claims must be awarded pursuant to 42 U.S.C. § 1988.[101] Balough is also correct that fees will only be granted if "plaintiff's claims are found to be unreasonable, frivo-

lous, meritless, or vexatious."[102] In this case, FNSB did not seek, nor was it granted, attorney's fees pursuant to 42 U.S.C. § 1988. In fact, the superior court's award of attorney's fees to FNSB in the direct civil suit specifically stated that the award was "based only on non–1983 claims, which the court estimates at 50% of the time and effort spent." In *Lyman v. State*, this court reversed an award of attorney's fees in a case that involved both Section 1983 and non-Section 1983 claims because "[t]he record [did not] include enough information to determine whether the costs and attorney's fees derive from defending the state law claim as distinguished from the federal law claims."[103] In the instant case, FNSB submitted to the superior court an eight-page itemization of attorney time spent on the direct civil suit. The amount of fees awarded to FNSB in Balough's direct civil suit, $2,500, equals one-half of twenty percent of FNSB's actual attorney's fees. We conclude that the superior court did not abuse its discretion in awarding FNSB attorney's fees, pursuant to Civil Rule 82, limited to defending Balough's non-Section 1983 claims.

For the same reasons we conclude that the superior court's award of FNSB's costs incurred in defending the non-Section 1983 claims was also not an abuse of discretion. The court specifically stated that "[t]he costs [were] apportioned to eliminate § 1983 costs. Since this case was not originally filed as an [administrative] appeal, the transcripts are a recoverable cost." The superior court based its award of costs on an itemized list submitted by FNSB. The court rejected many of FNSB's requested costs. Lastly, FNSB did in fact file a notice of cost bill hearing; it simply did so after its motion to accept a late filing of cost bill was granted.

We conclude that there was no error in the superior court's decision in the direct civil

---

**99.** *See id.* at 371 (stating that, when the superior court treats a case as an administrative appeal, "the Appellate Rules, not the Civil Rules, govern the award of attorney's fees").

**100.** *See Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).

**101.** *See Diedrich*, 805 P.2d at 370.

**102.** *Id.* (internal quotations omitted).

**103.** 824 P.2d 703, 707 (Alaska 1992).

action. Thus we affirm the award of attorney's fees and costs in that proceeding.

## IV. CONCLUSION

We VACATE the judgment of the superior court which affirmed the decision of the BOA, and direct that it REMAND the case to the BOA to determine whether Balough's property can be brought into compliance with FNSBCO 8.16.030. If Balough's property can be brought into compliance with the ordinance, and Balough does so, then Balough must be afforded her rights under FNSBCO 18.56.020, the "grandfather rights" ordinance. On the other hand, if Balough's property cannot be brought into compliance with FNSBCO 8.16.030, or if it can be and Balough declines to do so, then Balough either has no rights under the "grandfather" ordinance or has chosen to waive any rights she may have had, as the case may be. The superior court shall then enter judgment granting Balough rights under FNSBCO 18.56.020, or affirm the decision of the BOA denying Balough's claimed rights. Attorney's fees and costs shall be entered in accordance with the ultimate decision of the superior court following the BOA proceedings.

We AFFIRM the judgment of the superior court dismissing all of Balough's remaining claims, and awarding FNSB attorney's fees and costs, in the direct civil action.